**The STATE of Texas FOR THE PROTECTION OF Amanda COCKERHAM, Appellant,**

v.

**James L. COCKERHAM, Appellee.**

**No. 06–06–00096–CV.**

Court of Appeals of Texas, Texarkana.

Submitted March 7, 2007.

Decided March 21, 2007.

---

**21.** *See* n. 3, *supra.*

Andrea L. March, Andrea L. Sloan, Elizabeth Pearsall Lippincott, Women's Advocacy Project, Austin, for appellant.

Jack W. Gooding, Gooding Law Firm, Texarkana, for appellee.

Before MORRISS, C.J., CARTER and MOSELEY, JJ.

## OPINION

Opinion by Justice MOSELEY.

Amanda Cockerham appeals from a protective order entered on behalf of her father, James L. Cockerham, against her. She had applied for a protective order against her father and, after an extensive hearing, the trial court found that both father and daughter had engaged in family violence; the trial court ordered both to counseling and issued separate protective orders, which had the effect of directing them (with some exceptions) to remain at least 500 yards away from each other.

Although evidentiary sufficiency is not at issue, we provide a general summary of the evidence introduced at the hearing to create a context for our analysis.

## BACKGROUND OF CONTROVERSY

After twenty-three stormy years of marriage (during which James often worked for long stretches away from home), James and Diana Cockerham were engaged in a divorce.

The incident giving rise to the court proceedings appears to have been a veritable donnybrook which sprang up at the Cockerham home (which was then occupied by Diana and not James). Amanda, the Cockerhams' twenty-year-old daughter, testified that, during an angry and animated scene involving all three of them, Amanda was clinging to James's ankles as he tried to leave the house; James first slammed her head against the drywall paneling of the garage and then banged it on the floor. Diana testified that James had barred Amanda's entry into the house from the garage and, in doing so, had pushed and shoved her, cursing all the while. During this, he shoved Amanda back into the garage, her forehead hit the wall, and she fell. James then seized Amanda by the shoulders and "beat her head three to four times."

James testified that, during the course of the fracas, Diana had struck him in the face. He further testified that Amanda pushed and shoved James, knocking his cell phone out of his hand as he tried to leave (after he had called 9–1–1); Diana then grabbed him around the neck to prevent him from carrying their younger daughter to his car. James stated that Amanda had grasped him around the ankles and would not turn loose of him to let him leave even after he put the younger daughter down. He testified that he had banged Amanda's head against the wall while trying to escape from her grasp but

denied that he had grabbed her by the shoulders and hit her head on the floor. James testified that Diana, not he, was the one being verbally abusive and that her behavior was long-standing and repetitive. James also testified that, because of threats made by Amanda and Diana against him, he had removed the firearms from the house some time earlier, lest they be used against him.

James's mother, Betty Cockerham, was present for the last part of the altercation. After the initial fight occurred, James had gone to her nearby home and asked his parents to come to his house before "something bad happens." She witnessed no violent behavior, but testified that Diana was screaming profanities at James and that Amanda was sitting, nauseated. Peace officers had arrived, and James's mother and the police officer took Amanda to the emergency room. James's mother testified that she had spoken with Amanda a number of times and that Amanda had explicitly and quite seriously stated that she wanted to "kill [her daddy]."

Amanda went to the office of the district attorney and obtained its assistance in filing an application for a protective order against James. After having been served with notice, James appeared with counsel at the hearing.

After having heard the evidence, the trial court made findings that both James and Amanda had committed family violence and entered two separate family violence protective orders, both to expire in December 2006, six months after entry.

In one of the orders, the court granted Amanda's application for a protective order against James. That order has not been contested and has now expired due to the passage of time.

In the second protective order, the court issued the order pursuant to Chapter 85 of the Texas Family Code. It mirrors the first order, except that it protects James from Amanda. It has likewise expired by its own terms.

A single contention has been raised by the State on behalf of Amanda: that the trial court had no authority to enter a protective order against Amanda because James did not file a petition seeking such relief.

## IS THIS ISSUE MOOT?

Both orders have expired. James has raised the issue of whether the controversy has become moot upon the expiration of the orders. Before reaching the merits, we must first determine whether there is a live controversy to be resolved, or whether the matter has now become moot and unreviewable.

### 1. The Rule on Mootness

■■■ The general rule is that a case becomes moot (and thus unreviewable) when it appears that one seeks to obtain relief on some alleged controversy when in reality none exists, or on some matter which, when granted, cannot have any practical legal effect on a then-existing controversy. *Tex. Dep't of Public Safety v. LaFleur*, 32 S.W.3d 911, 913–14 (Tex. App.-Texarkana 2000, no pet.); *Pope v. City of Dallas*, 636 S.W.2d 244, 247 (Tex. App.-El Paso 1982, no writ).[1] The protective order in favor of James has expired. No actual controversy now exists between

---

1. In such a situation, there has ceased to be a controversy, and any decision by this Court would be an impermissible advisory opinion. *Olson v. Comm'n for Lawyer Discipline*, 901 S.W.2d 520 (Tex.App.-El Paso 1995, no writ). In determining whether a case is moot, the Court may consider anything that bears on the question. *Hunt Oil Co. v. Fed. Power Comm'n*, 306 F.2d 359, 361 (5th Cir.1962); *Shelby Operating Co. v. City of Waskom*, 964 S.W.2d 75, 81 (Tex.App.-Texarkana 1997, pet. denied).

the parties; the issue regarding the enforcement of the protective order against Amanda is moot. *See Nat'l Collegiate Athletic Ass'n v. Jones,* 1 S.W.3d 83, 86 (Tex.1999). Appellate courts decide only those issues in which a controversy exists. *Camarena v. Tex. Employment Comm'n,* 754 S.W.2d 149, 151 (Tex.1988). "The rule is generally accepted that appellate courts do not decide cases where no actual controversy exists between the parties at the time of the hearing." *City of W. Univ. Place v. Martin,* 132 Tex. 354, 356, 123 S.W.2d 638, 639 (1939). Unless an exception to this general rule exists, it would be proper to dismiss this appeal as moot.

### 2. Exceptions to the Rule

There are exceptions allowing an appellate court to review a case after it becomes moot. Texas courts have recognized three exceptions to the mootness doctrine: (1) the capable-of-repetition-yet-evading-review exception; (2) the collateral consequences exception; and (3) the public interest exception. *See Fed. Deposit Ins. Corp. v. Nueces County,* 886 S.W.2d 766, 767 (Tex.1994) (recognizing first two exceptions); *Nat'l Cafe Servs., Ltd. v. Podaras,* 148 S.W.3d 194, 197 n. 4 (Tex.App.-Waco 2004, pet. denied); *Ngo v. Ngo,* 133 S.W.3d 688, 691 (Tex.App.-Corpus Christi 2003, no pet.); *Securtec, Inc. v. County of Gregg,* 106 S.W.3d 803, 810–11 (Tex.App.-Texarkana 2003, pet. denied). This Court addressed the first and third exceptions at some length in *LaFleur,* 32 S.W.3d at 914.

### 3. Collateral Consequences of Issuance of a Protective Order

We find that the second exception to the mootness rule applies to this appeal. The collateral consequences exception has recently been analyzed once again by the Texas Supreme Court in *Marshall v. Housing Auth. of City of San Antonio,* 198 S.W.3d 782, 789 (Tex.2006). The court held that the collateral consequences ex-

ception to the mootness doctrine is invoked only under narrow circumstances when vacating the underlying judgment will not cure the adverse consequences suffered by the party seeking to appeal that judgment. *Id.* As described by the court, such narrow circumstances exist when,

> as a result of the judgment's entry, (1) concrete disadvantages or disabilities have in fact occurred, are imminently threatened to occur, or are imposed as a matter of law; and (2) the concrete disadvantages and disabilities will persist even after the judgment is vacated.

*Id.* (for mootness); *see Spencer v. Kemna,* 523 U.S. 1, 8, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998); *see also Gen. Land Office of State of Tex. v. OXY U.S.A., Inc.,* 789 S.W.2d 569, 571 (Tex.1990) (noting collateral consequences exception invoked only when prejudicial events have occurred whose effects will continue to stigmatize after dismissal of case as moot).

Although the court in *Marshall* did focus to some degree on evidence that the party had suffered or would suffer any concrete disadvantages or disabilities, the disadvantages to Marshall would arise (for the most part) as a result of the application of the law to the acknowledged situation rather than matters subject to proof, and the disadvantages would be of such a nature that they would persist beyond the judgment.

In this case, Amanda sets out several items that she argues demonstrate the disadvantages or disabilities that will result from the imposition of a protective order against Amanda. Section 86.0011 of the Texas Family Code requires that information to be entered into the state-wide law enforcement information system, where it would presumably remain available for various purposes, each purpose being one which could adversely impact her. Tex.

FAM.CODE ANN. § 86.0011 (Vernon 2002). Amanda suggests that this might preclude her from the ability to obtain public funds under the Texas Crime Victim's Compensation Program—because it explicitly excludes applicants whose behavior contributed to the crime.[2]

Amanda also correctly points out that information that she was subject to a protective order would be negatively viewed in a number of other scenarios (such as when seeking employment or seeking custody of children, the showing of a history of family violence has an adverse impact). Several intermediate courts of appeals have likewise acknowledged that the effects of a protective order carry significant collateral legal repercussions and a social stigma even though the protective order has expired. *See In re Salgado*, 53 S.W.3d 752, 757–58 (Tex.App.-El Paso 2001, orig. proceeding); *James v. Hubbard*, 21 S.W.3d 558, 560–61 (Tex.App.-San Antonio

2000, no pet.); *In re Cummings*, 13 S.W.3d 472, 475 (Tex.App.-Corpus Christi 2000, no pet.).[3]

The Texas Family Code requires a court to consider the commission of family violence in determining child custody arrangements. *See* TEX. FAM.CODE ANN. § 153.004 (Vernon Supp.2006).[4] We also note that there are possible legal consequences that could occur should Amanda be later convicted of other criminal acts.[5] All in all, we agree with those courts that there is a serious social stigma connected with such an order, and we also acknowledge that there are substantial legal repercussions that will continue to exist even after the ending of the protective order. These social and legal consequences would bear the distinct possibility of casting an adverse impact on Amanda in the future.

### 4. Merits of the Claim

is in the best interests of a child. TEX. FAM. CODE ANN. § 153.131(b) (Vernon 2002). That presumption may be removed through a finding of a history of family violence. *Id.; Stallworth v. Stallworth*, 201 S.W.3d 338, 347 (Tex.App.-Dallas 2006, no pet.).

---

**2.** The Attorney General's Web site (http://www.oag.state.tx.us/victims/cvc.shtml), apparently relying on Article 56.41(b) of the Texas Code of Criminal Procedure, states that "Benefits may be reduced or denied if the behavior of the victim contributed to the crime." *See* TEX.CODE CRIM. PROC. ANN. art. 56.41(b) (Vernon 2006).

**3.** *See generally In re Guardianship of Keller*, 171 S.W.3d 498, 501 (Tex.App.-Waco 2005, pet. denied), *rev'd on other grounds, Zipp v. Wuemling*, 218 S.W.3d 71 (Tex.2007).

**4.** When determining conservatorship, the trial court shall consider evidence of intentional abuse by a party within a two-year period prior to the commencement of the suit. TEX. FAM.CODE ANN. § 153.004(a). The court may not appoint joint managing conservators if "credible evidence" is presented of a history of child neglect or abuse. TEX. FAM.CODE ANN. § 153.004(b). When determining if "credible evidence" has been presented, the court shall consider whether a protective order was issued during the two-year period prior to the commencement of the suit. *Id.* § 153.004(f). There is a rebuttable presumption that the appointment of joint managing conservators

**5.** We also note possible federal repercussions from the entry of such an order finding the commission of family violence. The Fifth Circuit has concluded that a Texas protective order can justify a prosecution and conviction under the Brady Bill. 18 U.S.C.A. § 922(g)(8) (West 2000). That statute makes it unlawful for persons under certain court orders to possess, ship, or transport any firearm or ammunition. The order must restrain the person from harassing, stalking, or threatening an intimate partner or child, or from engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child. In such a case, a defendant has been convicted of unlawfully possessing a firearm while subject to the temporary order, in violation of Section 922(g)(8)(C)(ii). *United States v. Emerson*, 270 F.3d 203 (5th Cir.2001); *see United States v. Patterson*, 431 F.3d 832, 836 (5th Cir.2005).

Having determined that the issue of mootness is subject to the "collateral consequences" exception which would dictate that we not dismiss the claim as moot, we proceed to address the merits of Amanda's claim.

Amanda contends that the protective order against her is void because James did not apply for a protective order. Her argument is based on general rules of pleading and on Section 82.022 of the Texas Family Code, which reads as follows:

### § 82.022. Request by Respondent for Protective Order

To apply for a protective order, a respondent to an application for a protective order must file a separate application.

TEX. FAM.CODE ANN. § 82.022 (Vernon 2006). There was no separate application by James seeking a protective order against Amanda. We recognize that the statute does not say "to *obtain* a protective order" or "before the court may *enter* a protective order." Either formulation would end the discussion. The statute explicitly requires applications for protective orders to be made separately.

■ Amanda's arguments under the Texas Rules of Civil Procedure are grounded on the basic idea that the judgment shall conform to the pleadings. *See* TEX.R. CIV. P. 301. There are sizable exceptions to that concept, most of which have to do with the idea that a matter may be tried by consent. Under those theories, unpleaded claims or defenses that are tried by express or implied consent of the parties are treated as if they had been raised by the pleadings. *Roark v. Stallworth Oil & Gas, Inc.*, 813 S.W.2d 492, 495 (Tex.1991). The corollary is that the party who allows an issue to be tried by consent and who fails to raise the lack of a pleading before submission of the case cannot later raise the pleading deficiency for the first time on appeal. *Id.* In this case, all of the details of the fracas giving rise to the violent acts by James against Amanda which prompted her to seek a protective order were relevant. Amanda could not have successfully raised an objection to any part of the evidence concerning her role in the events which transpired. Trial by consent does not apply when the evidence of the unpleaded matter is relevant to the pleaded issues because it would not be calculated to elicit an objection. *In re J.M.*, 156 S.W.3d 696 (Tex.App.-Dallas 2005, no pet.). Therefore, there was no trial by consent of the issue of a protective order against Amanda.

The first indication in the record that a protective order might be forthcoming from the trial court was upon its announcement that there were to be protective orders issued against both Amanda and James. Further, James did not seek a protective order either before the hearing or at any point during the hearing; it is clear that the trial court acted sua sponte in issuing the protective order against Amanda. Trial counsel for Amanda objected at that time, but the court overruled the objection.

■ A protective order is in the nature of a civil injunction. *See* TEX. FAM.CODE ANN. § 88.002(5) (Vernon 2002). The applicant for a protective order must allege that the respondent has committed an act of family violence. TEX. FAM.CODE ANN. § 82.004 (Vernon 2002). The application must then be served on the respondent in the same manner as citation under the Texas Rules of Civil Procedure. TEX. FAM. CODE ANN. § 82.043 (Vernon 2002). The respondent may, but is not required to, file an answer. TEX. FAM.CODE ANN. § 82.021 (Vernon 2002); *Harris v. State*, 164 S.W.3d 775, 780 (Tex.App.-Houston [14th Dist.] 2005, pet. ref'd).

James now argues that the court had authority to enter an order against both parties to such a proceeding and that the same is explicitly permitted in the Texas Family Code.[6]

Further, Section 85.001(a) of the Texas Family Code directs the trial court to find, at the end of a hearing on an application for protective order, whether family violence has occurred and whether it is likely to occur in the future. TEX. FAM.CODE ANN. § 85.001(a) (Vernon 2002).

If the court does so, the section goes on to set out the following procedure:

> (b) If the court finds that family violence has occurred and that family violence is likely to occur in the future, the court:
>
> > (1) shall render a protective order as provided by Section 85.022 applying only to a person found to have committed family violence; and
> >
> > (2) may render a protective order as provided by Section 85.021 applying to both parties that is in the best interest of the person protected by the order or member of the family or household of the person protected by the order.

TEX. FAM.CODE ANN. § 85.001(b). The chain of counsel's argument is this: subsection (a) requires the court to find whether family violence occurred. Subsection (b) builds on that finding. If found, it *requires* the court to then enter a protective order applying to the person found to have committed family violence. The section continues to *allow* the court to enter an order applying to *both parties* that is in the best interest of the person protected by the order (or member of the family or household of the person protected by the order).

Counsel argues that subsection (b)(2) would not be part of the Code unless the Legislature intended to give trial courts the flexibility to issue orders to protect any family member as necessary and points out that this section was added by the Legislature after the Corpus Christi Court of Appeals' opinion in *Moreno v. Moore*, 897 S.W.2d 439 (Tex.App.-Corpus Christi 1995, no writ), on which Amanda relies.

Counsel correctly points out that Section 85.001(b)(2) directly allows multiple protective orders because it speaks of the best interest not only of the applicant, but of both parties. Although the statement is correct, this subsection does not apply because its scope is limited to a protective order as authorized by Section 85.021. That section involves prohibiting parties from taking children or disposing of property, and also gives authority to grant possession of a residence or possession of a child, or support, or the use of property. None of the restrictions in the order involve the matters raised in this case; the order is taken directly from the next section, 85.022.

*Moreno* reviewed a "mutual protective order" issued although one party did not request that such an order be issued. The argument there was very close to the one raised in this case: the judgment does not conform to the pleadings, and to obtain a protective order, a petition or request for one must be made.

There has been no change in TEX.R. CIV. P. 301 since *Moreno* was decided. The statutes used in *Moreno*, though now identified by different section numbers after recodification (and with the exceptions noted above), remain essentially unchanged.

In *Moreno*, the court entered a single mutual protective order (i.e., one order

---

6. *See* TEX. FAM.CODE ANN. §§ 85.001(b)(2), 85.003(b) (Vernon 2002).

which applied to the actions of two persons) with no agreement; this was in direct contravention of the requirements of the statute. The court held that the parties' failure to have an agreement prevented the court from entering a single protective order applying to both of them; Ronald had to file a separate application for a protective order if he wanted to receive a protective order against Refugia. *Moreno*, 897 S.W.2d at 442. This application not having been made, the court concluded that the trial court had no authority to enter the part of the mutual protective order granting Ronald a protective order against Refugia.

In 1995, effective after *Moreno*, the statute was reformatted and amended but it retained portions of the same requirements. It continued to provide explicitly that a mutual protective order was improper, but deleted the language allowing this to be done if it were entered with the agreement of the parties (and moved it to Section 71.10). In new subsection (a), the statute continued to state that to "apply for a protective order against an applicant, the respondent must file a separate application." Subsection (c) explicitly stated that mutual orders were impermissible. The Legislature also added this language:

> (e) A court that enters separate protective orders under this section that apply to both parties and require both parties to do or refrain from doing an act . . . shall issue two distinct and independent protective orders that reflect

the appropriate conditions for each of the parties.

> (f) A court that enters protective orders under this section that apply to both the respondent and the applicant and that require the respondent to do or refrain from doing an act . . . shall issue the protective orders in two separate documents. . . . .

Act of May 18, 1995, 74th Leg., R.S., ch. 1024, § 13, 1995 Tex. Gen. Laws 5095, 5101.

This change in the statute categorically permits protective orders which constrain more than one party; however, the only real result of this change merely requires the orders to be separate and not in one document; this is consistent with the holding in *Moreno*.[7]

The question remains as to whether the court's authority or discretion to enter a protective order is limited to only the benefit of the applicant. Section 85.001 is not so clear in that respect as one might wish. It requires a hearing, a finding that family violence has occurred in the past and is likely to occur in the future, and then if so requires the court to render a protective order applying—not to the respondent, but "only to a person found to have committed family violence." TEX. FAM.CODE ANN. § 85.001(b)(1) (Vernon 2002). This might suggest that a trial court, upon learning through the evidence that more than one person had committed family violence, could issue such protective orders as the

**7.** The other change from that session of the Legislature moved part of the statute to Section 71.10 and rewrote it as follows:

> (d) If the court approves an agreement between the parties as authorized under Section 71.12, the court shall issue a protective order under this section that is in the best interest of the applicant, the family or household, or a member of the family or household.

Act of May 18, 1995, 74th Leg., R.S., ch. 1024, § 10, 1995 Tex. Gen. Laws 5095, 5099 (current version at TEX. FAM.CODE ANN. § 85.005 (Vernon 2002)).

Under that change, although an approved agreement allows the court to issue a protective order in the interest of various parties, it also does not allow it to be done within the same order.

trial court sees fit under the circumstances.

There are, however, other portions of the statutory scheme that suggest the contrary. For example, as previously noted, Section 82.022 states that a respondent to an application must file a separate application. Section 85.001(c) explains that a protective order must include a finding of family violence and it presumes that there will be a "first" applicant. The scheme requires a hearing to be set on the application no later than fourteen days after the date of filing, but also provides that if the respondent receives notice of an application within forty-eight hours of the date set for a hearing on the application, the court is required to reschedule the hearing (presumably so that adequate opportunity may be allowed to prepare to defend against the application) and further provides that the court may not delay a hearing in order to consolidate it with a hearing on a subsequently-filed application. TEX. FAM.CODE ANN. §§ 84.001, 84.004 (Vernon 2002).

All of these factors, especially considered in tandem with the pleading requirements of TEX.R. CIV. P. 301, suggest that a separate application by a respondent must be filed and adequately served before a protective order may be issued on his or her behalf. We note that TEX. FAM.CODE ANN. § 82.004 (Vernon 2002) (which prescribes the content of the application for a protective order which is to be issued after hearing) and TEX. FAM.CODE ANN. § 82.041 (Vernon 2002) (which sets out the required contents of a notice served on a respon-

dent) provide very little information to the respondent as to the incident or incidents which gave rise to the alleged need for the issuance of a protective order.[8] The statutes do not require that either the application or the notice specify the act or acts which precipitated the claim of family violence (even as to the time or place it occurred) or any other information except for the name of the applicant and the date and time of the hearing. Pragmatically, such notice provides no real notice of any concrete claim that a respondent might be expected to defend against; it only provides notice of the identity of the accuser and the relationship between accuser and defendant, and the date and time of hearing.

With such minimal requirements, Amanda's argument that she was entitled to additional notice so that she could respond to any claim is sapped of much of its strength because of the paucity of the information which is required to be included in the notice. She already knew the identity of the other person, her relationship to him, and the name and county of their residence; that is virtually all that the statutes require.[9] The only additional requirement is that the application contain "a request for one or more protective orders." TEX. FAM.CODE ANN. § 82.004(4).

That requirement, however, does create a different mindset for parties and counsel when entering the courtroom. If another application had been filed, Amanda would at the barest minimum be informed that

---

8. This contrasts radically with the requirements of an application for a temporary protective order as prescribed in Section 82.009 of the Texas Family Code, which demands that "a detailed description of the facts and circumstances concerning the alleged family violence" be included. TEX. FAM.CODE ANN. § 82.009 (Vernon 2002).

9. This lack of any requirement of any specificity whatsoever is troubling, especially in light of the quasi-criminal nature of the proceedings, and of the previously mentioned collateral consequences of entry of a protective order based on a finding of family violence.

she was entering a hearing on the defensive as well as on the offensive.

In summary, the opinion in *Moreno* relied on two factors. One factor was the use of a mutual order, which is not an issue in this case. The second factor was the absence of pleadings, which is exactly the problem before the Court in this case.

■ The purpose of the pleading requirements of Rule 301 of the Texas Rules of Civil Procedure are to provide notice of the matters to be heard. Tex.R. Civ. P. 301. Although that notice may be waived or pleadings filed late, neither situation exists here. In this situation, the case proceeded on only one pleading and request for relief; there was no indication to Amanda or her counsel that her father was also seeking entry of such an order. In fact, the record indicates that James was not seeking such an order. Even though the notice requirements are meager, they do exist for a good reason: to allow a respondent to realize that he or she must marshal a defense. In the absence of any provision for such an opportunity and because James did not file such an application, we conclude that the trial court had no authority to enter the protective order sua sponte in favor of James.[10]

We hold that the trial court lacked authority to enter such an order under these facts and that its order rendered against appellant is void. We sustain Amanda's issue.

Having sustained the appellant's first issue, we reverse the trial court's judg-

ment and render the judgment void. We hereby set aside the order.[11]

---

10. We do not imply that a trial court is powerless in such circumstances, as a court genuinely concerned for the safety of the parties before it could sua sponte provide either injunctive relief short of a protective order or issue a restraining order. That issue is not before us.

11. Tex.R.App. P. 43.2(c); *see La.-Pac. Corp. v. Newton County,* 149 S.W.3d 262, 265 (Tex. App.-Eastland 2004, no pet.) (reversing and rendering based on determination that an order was void).