Basil SCHABAN–MAURER, Appellant,

v.

Anna MAURER–SCHABAN, Appellee.

No. 2–06–368–CV.

Court of Appeals of Texas,
Fort Worth.

Oct. 11, 2007.

---

Gerald Tadlock, Dallas, for Appellant.

Robert T. Stites, John T. Eck, Fort Worth, for Appellee.

PANEL B: LIVINGSTON, WALKER, and MCCOY, JJ.

## OPINION

SUE WALKER, Justice.

### I. INTRODUCTION

Appellant Basil Schaban–Maurer appeals the trial court's "Final Decree of Divorce." In three issues, Basil alleges that the trial court erred by making a disproportionate award of the community estate to Appellee Anna Maurer–Schaban, issuing a protective order against Basil, and ordering Basil to pay $700 per month in child support. We will affirm.

### II. FACTUAL AND PROCEDURAL BACKGROUND

Anna moved to the United States in 1994 and married Basil soon after her arrival. At the time, Basil had a bachelor's and a master's degree in architecture. After the two were married, Anna attended college for approximately three years, during which time Basil supported her by working as an architect for various firms in the Dallas/Fort Worth area. The same year that Anna completed her education and entered the workforce, Basil stopped working full-time and instead worked sporadically, never holding down a job for more than one year and eventually giving up all efforts at obtaining employment. From 2000 up until the time of the divorce in 2006, Basil did not earn a salary. During that time, however, Basil entered a Ph.D. program, taking approximately one class per semester.

In 2002, the couple had their first child. Three years later, they had their second child. The trial court heard testimony that, despite the fact Basil stayed at home, the children went to daycare during the day and that Anna attended to the children and the household chores after getting home from work. Furthermore, the trial court heard and saw evidence of domestic abuse by Basil against Anna.

Driven by her frustration at Basil's distaste for employment, failure to contribute to the family unit, and domestic violence, Anna filed for divorce in late 2005. Fearing that leaving Basil and taking the children would spark more domestic violence, Anna also sought a protective order, which was granted in November 2005.[1]

In September 2006, the trial court conducted proceedings to determine the terms of the final divorce decree. At the conclusion of these proceedings, the trial court awarded a disproportionate amount of community property to Anna and ordered Basil to pay $700 per month for child support. Basil now appeals.

---

**1.** Basil appealed the associate judge's decision granting the protective order. The trial court affirmed the associate judge's decision in late November 2005 after a hearing.

### III. DISPROPORTIONATE COMMUNITY PROPERTY AWARD TO WIFE

In his first issue, Basil contends that the trial court abused its discretion by making a disproportionate community property award to Anna.

#### A. Standard of Review

■ In a divorce proceeding, the trial court is charged with dividing the community estate in a "just and right" manner, considering the rights of both parties. TEX. FAM.CODE ANN. § 7.001 (Vernon Supp. 2006); *Boyd v. Boyd*, 131 S.W.3d 605, 610 (Tex.App.-Fort Worth 2004, no pet.). Trial courts are afforded wide discretion in dividing marital property upon divorce; therefore, a trial court's property division may not be disturbed on appeal unless the complaining party demonstrates from evidence in the record that the division was so unjust and unfair as to constitute an abuse of discretion. *Jacobs v. Jacobs*, 687 S.W.2d 731, 733 (Tex.1985); *Boyd*, 131 S.W.3d at 610.

■ To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex.1985), *cert. denied*, 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986). We must indulge every reasonable presumption in favor of the trial court's proper exercise of discretion in dividing marital property. *Boyd*, 131 S.W.3d at 610. Accordingly, we will re-

verse only if the record demonstrates that the trial court clearly abused its discretion, and the error materially affected the just and right division of the community estate.[2] *Id.*

#### B. Factors for Determining Community Property Division

■ In exercising its discretion, the trial court must order an equitable, but not necessarily equal, division of the community estate. *Tenery v. Tenery*, 932 S.W.2d 29, 29 (Tex.1996); *Taylor v. Taylor*, No. 02–05–00435–CV, 2007 WL 2460359, at *9 (Tex.App.-Fort Worth, Aug.31, 2007, no pet. h.) (mem.op.). In dividing the estate, the trial court can consider a variety of factors, and it is presumed that the trial court exercised its discretion properly. *Bell v. Bell*, 513 S.W.2d 20, 22 (Tex.1974); *Campbell v. Campbell*, 625 S.W.2d 41, 43 (Tex.App.-Fort Worth 1981, writ dism'd).

■ Some of the factors the trial court can consider include the spouses' capacities and abilities, benefits which the party not at fault would have derived from continuation of the marriage, business opportunities, education, relative physical conditions, relative financial condition and obligations, size of the separate estates, and the nature of the property. *See Schlueter v. Schlueter*, 975 S.W.2d 584, 588 (Tex.1998); *Murff v. Murff*, 615 S.W.2d 696, 699 (Tex.1981).

■ In addition to the factors set forth in *Murff*, the trial court may also consider fraud on the community, wasting of community assets, child custody, and

2. When an appellant challenges a property division, we will usually first determine whether the trial court had sufficient evidence upon which to exercise its discretion before evaluating whether the trial court abused that discretion. *Boyd*, 131 S.W.3d at 610; *In re T.D.C.*, 91 S.W.3d 865, 872 (Tex.App.-Fort Worth 2002, pet. denied) (op. on reh'g).

Here, however, Basil has waived this issue in his brief, saying, "Appellant does not challenge the initial question of whether the trial court had sufficient evidence or information upon which to exercise its discretion." Therefore, we will proceed to an evaluation of whether the trial court abused its discretion.

fault in the breakup of the marriage. *Baccus v. Baccus*, 808 S.W.2d 694, 700 (Tex. App.-Beaumont 1991, no writ); *see Massey v. Massey*, 807 S.W.2d 391, 401–02 (Tex. App.-Houston [1st Dist.] 1991, writ denied); *Eikenhorst v. Eikenhorst*, 746 S.W.2d 882, 890 (Tex.App.-Houston [1st Dist.] 1988, no writ). Additionally, although retirement benefits earned during marriage are generally community property that is subject to division, the trial court, in its discretion, may award such benefits to the party who earned them. *See Haynes v. McIntosh*, 776 S.W.2d 784, 788 (Tex.App.-Corpus Christi 1989, writ denied); *Hardin v. Hardin*, 681 S.W.2d 241, 243 (Tex.App.-San Antonio 1984, no writ); *Shields v. Shields*, No. 09–06–00334–CV, 2007 WL 2683524, at *2 (Tex. App.-Beaumont Sept.13, 2007, no pet. h.) (mem.op.).

## C. Disproportionate Community Property Award to Anna

In its findings of fact for this case, the trial court listed several factors it considered in dividing the property, including fault in the breakup of the marriage, fraud on the community, wasting of community assets by the spouses, and actual and constructive fraud committed by a spouse.[3] The trial court based these findings on testimony from Anna, Basil, and additional witnesses. First, Basil testified that he had a master's degree in architecture and was pursuing a Ph.D. in urban administration. Despite his high level of education, Basil and Anna both testified that Basil had not been employed since 2000 and that Basil's employment prior to 2000 was sporadic. Basil did not controvert Anna's testimony that he was mentally and physically capable of working.

Furthermore, the trial court heard testimony about potential fraud on the community estate committed by Basil. Anna testified about a community account that she maintained in her name with her wages. She said that Basil had secretly accessed, withdrawn, and hidden $22,000 from the account, refusing to share it with Anna. In his testimony, Basil never disputed that he had the money and had refused to share it, he only disputed how he came into possession of the money, alleging that Anna had transferred it into his account on her own free will but then changed her mind and wanted it back.

Additionally, Anna alleged that Basil had approximately $19,000 in cash stored in a cabinet, along with several valuable items of jewelry and household items, which, according to Anna, had a total value of approximately $15,000. Basil denied the existence of the $19,000 and said that, for the most part, Anna was in possession of the jewelry and household items.

Finally, the trial court heard testimony about Anna's retirement account, which constituted a large part of the property division awarded to Anna. Anna's uncontroverted testimony was that she had built up the retirement account with her wages. Basil additionally had retirement accounts in his name, though there was no testimony as to how those accounts were funded.[4]

Indulging every reasonable presumption in favor of the trial court's ruling, we cannot say that, given this testimony, the trial court abused its discretion. The trial court, as the sole judge of the witnesses'

---

3. A trial court can consider additional factors not listed in *Murff*. *Baccus*, 808 S.W.2d at 700. The trial court in this case did rely on such additional factors, but Basil's brief addresses only the *Murff* factors.

4. Because Basil refused to file an inventory with the trial court, only Anna's approximations in her inventory were available for review by the trial court.

credibility, could have believed Anna and not believed Basil regarding the $22,000 from the bank account, $19,000 in the cabinet, and $15,000 of jewelry and household items.[5] Because the trier of fact is in a better position to determine the candor, demeanor, and credibility of the witnesses, we will not substitute our judgment for that of the trial court. *See Garner v. Garner,* 200 S.W.3d 303, 308 (Tex.App.-Dallas 2006, no pet.).

Furthermore, the trial court acted in its discretion by awarding retirement benefits earned during the marriage to the party who earned them, thus giving Anna's retirement account to her and Basil's retirement accounts to him. *See Haynes,* 776 S.W.2d at 788; *Hardin,* 681 S.W.2d at 243; *Shields,* 2007 WL 2683524, at *3. Because the trial court acted within its discretion, we overrule Basil's first issue.

### IV. Protective Order

In his second issue, Basil argues that the trial court erred by granting the protective order because no evidence was presented that family violence would occur in the future.[6]

#### A. Mootness

Because the protective order of which Basil complains expired on October 24, 2006, our first determination must be whether this issue is moot. The general rule is that a case becomes moot, and thus unreviewable, when it appears that a party seeks to obtain relief on some alleged controversy when in reality none exists. *Williams v. Lara,* 52 S.W.3d 171, 184 (Tex.2001); *State for Protection of Cockerham v. Cockerham,* 218 S.W.3d 298, 301 (Tex.App.-Texarkana 2007, no pet.); *Sutton v. Sutton,* No. 02-05-00052-CV, 2005 WL 1993410, at *1 (Tex.App.-Fort Worth Aug. 18, 2005, no pet.) (mem.op.). If a case becomes moot, the parties lose their standing to maintain their claims. *Williams,* 52 S.W.3d at 184; *Sutton,* 2005 WL 1993410, at *1.

One of the major exceptions allowing an appellate court to review a case after it becomes moot is the collateral consequences exception. *FDIC v. Nueces County,* 886 S.W.2d 766, 767 (Tex.1994). Under this exception, the party must show that prejudicial events have occurred that will continue to stigmatize that person long after the judgment has ceased to operate. *Gen. Land Office v. OXY U.S.A., Inc.,* 789 S.W.2d 569, 571 (Tex.1990); *In re Cummings,* 13 S.W.3d 472, 475 (Tex.App.-Corpus Christi 2000, no pet.).

Generally, expired temporary protective orders are considered moot on appellate review. *James v. Hubbard,* 21 S.W.3d 558, 560 (Tex.App.-San Antonio 2000, no pet.). However, a protective order based on a finding of family violence carries a social stigma even after the order has expired. *Cockerham,* 218 S.W.3d at

---

5. Contrary to Basil's calculations, the trial court did not award Anna ninety-one percent of the community estate. Basil's calculations failed to take into account the fact that all of the community debt was awarded to Anna and that Basil retained possession of a car. Furthermore, while Basil claims in his brief on appeal that his calculations are based on values taken from Anna's inventory, Basil fails to compute the value of the property Anna claims, in her inventory, to have left with Basil.

6. In his "Issues Presented" section, Basil additionally argues that the trial court erred because there was insufficient evidence of past family violence. His "Argument" section for this issue, however, deals only with the issue of no evidence of future family violence. Therefore, we focus on evidence of future violence. We note that evidence of past violence is found throughout the record, as set forth in subsection D of this issue.

302; *Ex parte Flores,* 130 S.W.3d 100, 105 (Tex.App.-El Paso 2003, no pet.); *James,* 21 S.W.3d at 560; *In re Cummings,* 13 S.W.3d at 475. Furthermore, there are attendant legal consequences to being the subject of such a protective order; Texas Family Code section 153.004 mandates that a trial court must consider the issuance of a protective order in determining child custody. TEX. FAM.CODE ANN. § 153.004(f) (Vernon Supp.2006).

The protective order against Basil has expired. Thus, no actual controversy now exists between Basil and Anna regarding its enforceability, and that issue is moot. However, under the collateral consequences exception, we review the substance of this issue.

**B. Standard of Review**

■ While there is a split among the courts of appeals, in this court we review appellate challenges to the granting of protective orders for sufficiency of the evidence, measured by legal and factual sufficiency contentions. *See Jakobe v. Jakobe,* No. 02-04-00068-CV, 2005 WL 503124, at *1 (Tex.App.-Fort Worth 2005, no pet.) (mem.op.). *Compare Vongontard v. Tippit,* 137 S.W.3d 109, 112-13 (Tex.App.-Houston [1st Dist.] 2004, no pet.), *and B.C. v. Rhodes,* 116 S.W.3d 878, 883-84 (Tex.App.-Austin 2003, no pet.) (both applying legal and factual sufficiency standards of review), *with Thompson v. Thompson-O'Rear,* No. 06-03-00129-CV, 2004 WL 1243080, at *2 (Tex.App.-Texarkana June 8, 2004, no pet.) (mem.op.) (acknowledging that other courts apply legal and factual sufficiency standard of review, but applying abuse of discretion standard of review).

■ A legal sufficiency challenge may only be sustained when (1) the record discloses a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez,* 977 S.W.2d 328, 334 (Tex.1998), *cert. denied,* 526 U.S. 1040, 119 S.Ct. 1336, 143 L.Ed.2d 500 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 TEX. L.REV. 361, 362-63 (1960). In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable fact-finder could, and disregard evidence contrary to the finding unless a reasonable fact-finder could not. *City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex.2005).

■ Anything more than a scintilla of evidence is legally sufficient to support the finding. *Cont'l Coffee Prods. Co. v. Cazarez,* 937 S.W.2d 444, 450 (Tex.1996); *Leitch v. Hornsby,* 935 S.W.2d 114, 118 (Tex.1996). When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence. *Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983). More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about the existence of a vital fact. *Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co.,* 77 S.W.3d 253, 262 (Tex.2002).

■ An assertion that the evidence is factually insufficient to support a fact finding means that the evidence supporting the finding is so weak or the evidence to the contrary is so overwhelming that the answer should be set aside and a new trial ordered. *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965). We are required to consider all of the evidence in the case in

making this determination, not just the evidence that supports the finding. *Mar. Overseas Corp. v. Ellis,* 971 S.W.2d 402, 406–07 (Tex), *cert. denied,* 525 U.S. 1017, 119 S.Ct. 541, 142 L.Ed.2d 450 (1998).

### C. Determining Family Violence

A trial court shall render a protective order if, after a hearing, it finds that family violence has occurred and is likely to occur in the future. TEX. FAM.CODE ANN. §§ 81.001, 85.001 (Vernon 2002). "Family violence" means

> an act by a member of a family or household against another member of the family or household that is intended to result in physical harm, bodily injury, assault, or sexual assault or that is a threat that reasonably places the member in fear of imminent physical harm, bodily injury, assault, or sexual assault, but does not include defensive measures to protect oneself.

*Id.* § 71.004(1).

Basil limits this issue to the evidence supporting the trial court's finding that family violence is likely to occur in the future. Because the record does not contain evidence specifically related to Basil's likelihood of future violence, the central focus for this issue is whether evidence of past family violence will support a finding that future family violence is likely.

Case law over the past decade indicates the development of the principle recognizing that evidence a person has engaged in abusive conduct in the past permits an inference that the person will continue violent behavior in the future. *See In re Epperson,* 213 S.W.3d 541, 543 (Tex.App.-Texarkana 2007, no pet.); *In re T.L.S.,* 170 S.W.3d 164, 166 (Tex.App.-Waco 2005, no pet.); *In re M.G.M.,* 163 S.W.3d 191, 202 (Tex.App.-Beaumont 2005, pet. denied); *In re K.A.S.,* 131 S.W.3d 215, 223–25 (Tex. App.-Fort Worth 2004, no pet.); *Ulmer v.*

*Ulmer,* 130 S.W.3d 294, 300–01 (Tex.App.-Houston [14th Dist.] 2004, no pet.). Initially, trial courts relied on evidence of past violence as an indicator of future behavior in parental termination and child custody cases. *See In re T.L.S.,* 170 S.W.3d at 166; *In re A.T.,* No. 02–04–00355–CV, 2006 WL 563565, at *7 (Tex. App.-Fort Worth Mar. 9, 2006, no pet.) (mem.op.). Appellate courts have extended the principle to family violence protective order cases. *See In re Epperson,* 213 S.W.3d at 543; *In re M.G.M.,* 163 S.W.3d at 202; *Ulmer,* 130 S.W.3d at 299; *Pena v. Garza,* 61 S.W.3d 529, 532 (Tex.App.-San Antonio 2001, no pet.); *Banargent v. Brent,* No. 14–05–00574–CV, 2006 WL 462268, at *1 (Tex.App.-Houston [14th Dist.] Feb. 28, 2006, no pet.) (mem.op.).

In other cases, appellate courts have relied on a pattern of past violence to support a trial court's finding of likely future violence. In one case, the appellate court relied on a girlfriend's testimony that her boyfriend, against whom she sought the protective order, was "controlling and threatening" over the length of their relationship, which was less than one year. *In re Epperson,* 213 S.W.3d at 543. In that case, the boyfriend physically assaulted his girlfriend twice and left her threatening notes. *Id.*

In another case, the appellate court relied on a wife's testimony that the husband was emotionally, mentally, and physically abusive for several years. *In re M.G.M.,* 163 S.W.3d at 202. Another trial court relied on testimony that a husband had threatened to kill his wife, had stalked her after the divorce, had expressed a great deal of anger towards her, and had frequently yelled at her. *Ulmer,* 130 S.W.3d at 300. In both of these cases, the husbands adamantly insisted that they had not ever committed any act of violence against their respective wives. *In re*

*M.G.M.*, 163 S.W.3d at 202; *Ulmer*, 130 S.W.3d at 299.

These cases stand in stark contrast to the case relied on by Basil, *In re J.A.T.*, No. 13–04–00477–CV, 2005 WL 1981497, at *1 (Tex.App.-Corpus Christi Aug.18, 2005, no pet.) (mem.op.). In that case, the wife presented one instance where the husband pulled the child out of the wife's arms, resulting in the child being pulled between the two. *Id.* The appellate court found that this single act alone was insufficient to support a protective order against the husband as evidence of the likelihood of future violence. *Id.*

### D. Imposition of the Protective Order Against Basil

In contrast to the wife in *In re J.A.T.*, Anna presented evidence of a pattern of violence from Basil. Anna stated that in January 2003, Basil had pushed her into a wall and hit her shoulder so hard that it bruised; Anna supported her assertion with pictures. Furthermore, Anna testified regarding two instances where Basil attempted to rape her.

After Anna moved out and sought a divorce, Basil stalked Anna from their daughter's daycare to her new apartment, where he took their son from Anna's car. Anna also testified that on two occasions, when they were exchanging the children, Basil kicked in the door of her apartment. On one of these occasions, she said that after kicking in the door, Basil shoved her into a wall, grabbed her arm, held onto the phone (thereby preventing her from calling the police), and finally threw the phone at her, causing bruises that Anna had taken pictures of. In addition to these acts, Anna also testified to numerous occasions when Basil was verbally abusive, shouting obscenities at her and calling her foul names in the presence of the children. All of these instances led her to be afraid of Basil. Basil denied all of Anna's accusations.

Based on this record, we hold that the evidence was legally and factually sufficient to support the trial court's granting of the protective order. First, taking all inferences in favor of the trial court's finding, we conclude that based on Anna's testimony describing a pattern of physical and verbal assaults from Basil, there was more than a scintilla of evidence that Basil would continue acting violently toward Anna.[7] It was for the trial court alone to determine the credibility of the witnesses, and the trial court could have disregarded Basil's denials in their entirety. *See Garner*, 200 S.W.3d at 308 (stating that the trial court has the sole discretion to believe one party's evidence and not accept the other party's evidence). Therefore, it was reasonable for the trial court to conclude that Basil would commit or threaten to commit further acts of family violence.

Moreover, considering all of the evidence supporting the finding, we cannot say that the evidence was factually insufficient to support the trial court's decision. The evidence supporting Anna's accusations, including her testimony and pictures, along with the testimony of witnesses to the violence, in contrast to Basil's denials, was not so weak to support the finding or so against the overwhelming weight of the evidence as to be manifestly unjust. *Garza*, 395 S.W.2d at 823. We therefore overrule Basil's second issue.

### V. Child Support Calculations

In his third issue, Basil argues that the trial court abused its discretion by assess-

---

7. In fact, Basil did continue to act violently toward Anna after the trial court granted the protective order—spitting in her face while exchanging the children at the police station and making an obscene gesture in her direction during a break at the divorce proceedings themselves.

ing his monthly child support payments at $700.

## A. Standard of Review

 We review the trial court's order setting child support under the same abuse of discretion standard as applied to the trial court's property division. *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990). If there is some probative and substantive evidence to support the child support judgment, the trial court did not abuse its discretion. *In re P.J.H.*, 25 S.W.3d 402, 405 (Tex.App.-Fort Worth 2000, no pet.); *DuBois v. DuBois*, 956 S.W.2d 607, 610 (Tex.App.-Tyler 1997, no pet.) (citing *Holley v. Holley*, 864 S.W.2d 703, 706 (Tex.App.-Houston [1st Dist.] 1993, writ denied)). We will not revise the trial court's judgment merely because we consider the amount of the child support award either too high or too low. *In re P.J.H.*, 25 S.W.3d at 405.

## B. Determining Child Support With an Unemployed or Underemployed Parent

 The duty to support a child is not limited to a parent's ability to pay from current earnings but extends to his or her financial ability to pay from any and all sources that might be available. *In re Z.B.P.*, 109 S.W.3d 772, 783 (Tex.App.-Fort Worth 2003, no pet.); *In re P.J.H.*, 25 S.W.3d at 406. Thus, if a parent's actual income is significantly less than what he or she could earn because of intentional unemployment or underemployment, the trial court may apply the child support guidelines to that parent's earning potential. TEX. FAM.CODE ANN. § 154.066 (Vernon Supp.2006); *Logan v. Logan*, No. 02-05-00068-CV, 2006 WL 2167164, at *6 (Tex. App.-Fort Worth 2006, no pet.) (mem.op.).

 A parent who is qualified to obtain gainful employment cannot evade his or her support obligation by voluntarily remaining unemployed or underemployed. *Logan*, 2006 WL 2167164, at *6; *Eggemeyer v. Eggemeyer*, 535 S.W.2d 425, 427–28 (Tex.Civ.App.-Austin 1976), *aff'd*, 554 S.W.2d 137 (Tex.1977). Therefore, a trial court may order a parent to pay child support beyond the amount the parent's income would ordinarily indicate under the guidelines if the parent could potentially earn more money but has intentionally chosen not to. *See* TEX. FAM.CODE ANN. § 154.066; *Beach v. Beach*, No. 05-05-01316-CV, 2007 WL 1765250, at *3 (Tex. App.-Dallas June 20, 2007, no pet.) (mem. op.).

 For a trial court to find that a parent is intentionally underemployed or unemployed under section 154.006, there must be evidence that the parent reduced his or her income for the purpose of decreasing child support payments. *In re Z.B.P.*, 109 S.W.3d at 783; *In re P.J.H.*, 25 S.W.3d at 405–06. The requisite intent to be underemployed for the purpose of decreasing child support payments, however, may be inferred from such circumstances as the parent's education, economic adversities and business reversals, business background, and earning potential. *In re Z.B.P.*, 109 S.W.3d at 783; *In re P.J.H.*, 25 S.W.3d at 406.

Litigants have presented trial courts with a variety of cases in which the obligor parent was intentionally unemployed or underemployed. In one case, the obligor parent was unemployed for the five years preceding the hearing. *Pharo v. Trice*, 711 S.W.2d 282, 284 (Tex.App.-Dallas 1986, no writ). As an explanation for her unemployment, the parent said that she was busy researching genealogy, working with the library, playing tennis, and helping put together a cookbook. *Id.* The appellate court held that the trial court did not abuse its discretion by determining that

the parent was intentionally unemployed. *Id.*

In another case, the obligor parent argued that because the record showed neither a history of her actual earnings nor evidence of her capacity to earn a substantial sum of money, the trial court erred by determining child support based on her earning potential. *Giangrosso v. Crosley*, 840 S.W.2d 765, 769 (Tex.App.-Houston [1st Dist.] 1992, no writ). In that case, the parent had completed three years of college and, according to the appellate court, probably would have needed retraining before entering the workforce. *Id.* The appellate court held, however, that the parent possessed general skills and experience that would qualify her for employment. *Id.* Therefore, it was not a abuse of discretion for the trial court to find that a parent's choice to remain unemployed was not a valid excuse for avoiding child support obligations. *Id.*

In comparison to these cases, our court has determined that a finding of voluntary underemployment was an abuse of discretion when the obligor was a high school dropout with a GED, expected to earn minimum wage, and remained unemployed to take care of her children and elderly parents. *In re Z.B.P.*, 109 S.W.3d at 783.

## C. Child Support Upon a Determination of Basil's Underemployment

█ In finding of fact number nine, the trial court stated the following:

The Court finds that Basi[l] Schaban–Maurer is voluntarily underemployed and that if he were employed he would be capable of earning no less than $40,000 per year. The amount of child support ordered by the Court is in accordance with the percentage guidelines for an obligor earning $40,000 per year with adjustments made to address Anna Maurer–Schaban having to provide health and dental insurance coverage for the children.

In this case, Basil complains that the trial court did not have sufficient information upon which to calculate his net resources, resulting in an arbitrary child support calculation. The evidence showed, however, that Basil has a master's degree in architecture and had enrolled in a Ph.D. program for urban administration. Anna's uncontroverted testimony was that Basil had, in fact, worked as a full-time architect in approximately 1997 or 1998 and had been paid an annual salary of $40,000. An architect, who knew the job market for architects in 1997 and 1998, testified that the market in the late 1990s was excellent and that there were a variety of employment opportunities available.

Basil never explained why he stopped working in 1997 or 1998 (four years before Anna gave birth to their oldest child), but Anna testified that he simply liked sleeping late into the day, watching television, playing on the computer all night, and not having to go to a job. Anna testified, and Basil never refuted, that there was no reason, physically or mentally, Basil could not maintain employment. Even after the children were born, Anna's testimony was that Basil's only obligation to the children was to take them to daycare in the morning before returning home and going back to bed. Furthermore, Anna testified that the housekeeping and cooking were her responsibilities after picking up the children from daycare at the end of her workday.

Since the birth of his children, Basil has contributed little to their financial support because he has chosen to remain unemployed. Anna has been the sole financial provider for the children's living, medical, dental, daycare, and other expenses. The trial court heard testimony that the couple's oldest child was born with a birth

defect requiring several surgeries and on-going medical treatments, all of which Anna has paid for and will continue to pay for with insurance she must purchase from her employer under the trial court's final divorce decree.

Moreover, while Basil failed to present evidence of his income, the trial court heard evidence as to his expenses, which were approximately $4,199 per month apart from the expenses associated with the divorce proceedings. Basil could not account for how he paid for these ex-penses, except to say that his father had paid his attorney's retainer fee.

Indulging every presumption in favor of the trial court's judgment, we conclude that there is some probative and substan-tive evidence supporting the trial court's finding that Basil was underemployed and had an earning potential of $40,000 per year. *See In re P.J.H.*, 25 S.W.3d at 405. Therefore, we hold that the trial court did not abuse its discretion by ordering Basil to pay $700 per month in child support. We overrule Basil's third issue.

## VI. CONCLUSION

Having overruled all three of Basil's is-sues, we affirm the trial court's judgment.