

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

**NO. 2-06-269-CV**

NIKOLAI IVANOV KARENEV[1]                                        APPELLANT

V.

ELENA PETKOVA KARENEVA                                        APPELLEE

------------

FROM THE 393RD DISTRICT COURT OF DENTON COUNTY

------------

## MEMORANDUM OPINION[2]

------------

---

[1]In the trial court's final decree of divorce nunc pro tunc, husband's name is spelled "Nikolai Ivonov Kareneva." Other documents in the record, however, including husband's cross-petition, husband's notice of appeal, and both parties' briefs, as well as husband's testimony, indicate that the proper spelling is "Nikolai Ivanov Karenev."

[2]*See* TEX. R. APP. P. 47.4.

Nikolai Ivanov Karenev ("husband") appeals from the trial court's final decree of divorce nunc pro tunc.   In five issues, he complains that the trial court improperly found that he posed a risk of international abduction, unduly restricted his possession and access to his child, improperly divided the community estate, and erred in ordering child support based on his earning potential, unpaid temporary child support, and attorney's and amicus fees enforceable as child support.   We affirm in part and reverse and render in part.

Husband married Elena Petkova Kareneva ("wife") in 2000, and the one child of the marriage, a daughter, was born in 2002.   In late 2003, husband lost his job as a computer programmer where he earned approximately $120,000.00 (plus a $25,000.00 bonus) per year.   In 2004, husband informally helped with wife's law practice, Kareneva Law Firm ("KLF"), although he was not paid and the extent of his involvement was disputed.   Wife filed for divorce in November 2004.

The parties initially asked the court to appoint them both as joint managing conservators of the child.   In March 2005, however, the child's amicus filed an emergency motion based on lengthy emails—written in Bulgarian—that husband sent to wife that purportedly contained threats against wife and her mother and involved the child.   Husband was convicted of misdemeanor harassment for sending the emails.[3]   Based on these events, the trial court suspended husband's

---

[3]His appeal from that conviction is currently pending in this court.

access to the child and ordered a psychiatric evaluation of both parties. The court-ordered psychiatrist subsequently recommended that husband have no unsupervised visitation with the child until he dealt with his anger and rage at wife through counseling, and the trial court temporarily limited husband's access to the child to supervised visitation of two hours per week.

After a four-day trial, the trial court dissolved the marriage, divided the marital estate, and appointed wife as sole managing conservator of the child. Husband was appointed possessory conservator of the child with limited, supervised visitation only[4] and ordered to pay child support based on his earning potential, back due child support, and attorney's and amicus fees enforceable as child support. Husband appeals.

---

[4]The trial court granted husband supervised visitation of four hours each week, with two additional hours on some holidays and birthdays.

We review all of husband's issues for an abuse of discretion.[5] To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable.[6] Merely because a trial court may decide a matter within its discretion in a different manner than an appellate court would in a similar circumstance does not demonstrate that an abuse of discretion has occurred.[7]

An abuse of discretion does not occur where the trial court bases its decisions on conflicting evidence.[8] Furthermore, an abuse of discretion does not occur as long as some evidence of substantive and probative character exists to support the trial court's decision.[9] Legal and factual sufficiency are not

---

[5] *See Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990) (reviewing trial court's order setting child support for an abuse of discretion); *Murff v. Murff*, 615 S.W.2d 696, 699 (Tex. 1981) (applying abuse of discretion standard of review to trial court's division of marital estate); *Boyo v. Boyo*, 196 S.W.3d 409, 423–24 (Tex. App.—Beaumont 2006, no pet.) (setting out abuse of discretion standard of review of finding of risk of international abduction).

[6] *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985), *cert. denied*, 476 U.S. 1159 (1986).

[7] *Id.*

[8] *In re Barber*, 982 S.W.2d 364, 366 (Tex. 1998) (orig. proceeding).

[9] *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 211 (Tex. 2002).

4

independent grounds for error but are relevant factors in determining whether the trial court abused its discretion.[10]

In his first and second issues, husband contends that the trial court abused its discretion in finding a potential risk of international abduction of the child by husband and that the trial court's orders regarding possession and access to the child are unduly restrictive.

---

[10] *See Beaumont Bank, N.A. v. Buller*, 806 S.W.2d 223, 226 (Tex. 1991); *D.R. v. J.A.R.*, 894 S.W.2d 91, 95 (Tex. App.—Fort Worth 1995, writ denied).

If credible evidence is presented to the court indicating a "potential risk of the international abduction of a child by a parent," the court shall determine whether certain protective measures are necessary.[11]  To determine whether there is a risk of international abduction of a child by a parent, the trial court shall consider evidence that the parent

> (1) has taken, enticed away, kept, withheld, or concealed a child in violation of another person's right of possession of or access to the child, unless the parent presents evidence that the parent believed in good faith that the parent's conduct was necessary to avoid imminent harm to the child;
>
> (2) has previously threatened to take, entice away, keep, withhold, or conceal a child in violation of another person's right of possession of or access to the child;
>
> (3) lacks financial reason to stay in the United States, including evidence that the parent is financially independent, is able to work outside of the United States, or is unemployed;
>
> (4) has recently engaged in planning activities that could facilitate the removal of the child from the United States by the parent . . .;
>
> (5) has a history of domestic violence . . .; or
>
> (6) has a criminal history or a history of violating court orders.[12]

---

[11]TEX. FAM. CODE ANN. § 153.501(a) (Vernon Supp. 2007).

[12]*Id.* § 153.502(a) (Vernon Supp. 2007).

6

If, based on the above factors, the trial court finds that there is "credible evidence of a risk of abduction of the child," the court shall also consider the following factors in order to evaluate that risk:

(1) whether the parent has strong familial, emotional, or cultural ties to another country, particularly a country that is not a signatory to or compliant with the Hague Convention on the Civil Aspects of International Child Abduction; and

(2) whether the parent lacks strong ties to the United States, regardless of whether the parent is a citizen or permanent resident of the United States.[13]

The trial court found that credible evidence had been presented of a potential risk of international abduction of the child by the husband.[14]

---

[13]*Id.* § 153.502(b). The statute also provides additional factors that the trial court may consider. *See id.* § 153.502(c).

[14]Specifically, the trial court found the following:

- [Husband] has previously threatened to take, entice away, keep, withhold, or conceal the child in violation of [wife's] right of possession of or access to the child;

- [Husband] lacks financial reason to stay in the United States and is financially independent, able to work outside the United States, and unemployed;

- [Husband] has a history of domestic violence;

- [Husband] has a criminal history or a history of violating court orders;

- [Husband] has strong familial, emotional, or cultural ties to another country, Bulgaria.

The relevant evidence at trial showed as follows:

Wife testified that husband enrolled the child in school in Plano without wife's knowledge, listed his first ex-wife as the emergency contact, and as a result wife was once denied access to the child. Further, the visitation supervisor testified that husband told the child during a supervised visit that she was going to come live with him.[15]

Wife also testified that she was afraid husband would kidnap the child and return to Bulgaria, where both parties were born. Wife claimed that husband was a millionaire in Bulgaria, but husband only admitted owning, with his sister, a small apartment worth about twenty or thirty thousand dollars. Husband testified that he never intended to move back to Bulgaria, had two older daughters who live in the United States, and would not take the child anywhere without wife's consent. Husband admitted that his sister and many friends still live in Bulgaria, and wife claimed that husband traveled to Bulgaria three times in the preceding two years.

---

[15]Husband denied both of these allegations.

Wife also testified to threats, harassment, and domestic violence by husband. For example, wife testified that husband left "numerous voice mails on my answering machine, very threatening, menacing voice mails, name calling." In one, husband said that "God is going to punish [wife]." Further, wife testified to receiving threatening emails from husband, stating for example that "summer of 2006 is the last year of [her] life" and that both she and the child would be "purged of [their] sins." Wife also stated that husband sent threatening letters to her and followed her in his car on two occasions.

Husband admitted many of these allegations. For example, he admitted that he wrote the emails for which he was convicted of harassment. Husband also admitted making statements that wife might have misunderstood, including that wife's "life will be over the way [she] . . . knew it," "God will punish [her]," and "Do[es] [she] want [her] daughter to pay for [her] deeds." He also admitted asking wife or wife's mother to read letters he wrote to the child, writing "if you don't read the letter, may God judge you."

Wife's two children from a previous marriage told a CPS investigator that husband had hit them.[16] One of the step-daughters said husband also had pulled their hair and had hit the parties' child, saying that "he would stop when she

---

[16]Husband initiated the CPS investigation against wife after noticing a bruise on the child's ear during one of his supervised visitations. CPS eventually closed the investigation, finding that the injury was an accident.

stopped crying." Wife also testified that husband hit or shook the child on two or three occasions when she cried, would "knock" his step-daughters on the head and pull their hair, and threw a large pepper shaker in the direction of wife's mother. Husband denied hitting any of the children.

Husband testified that in June 2005, he began working as an independent insurance agent making $600.00 per month. He also testified, however, that his monthly expenses were $9,919.00 and that he was supplementing his income with loans from his sister and friends and his retirement account. Husband admitted he had not paid any child support despite the fact that a temporary order required him to do so.

We conclude that there is sufficient evidence to support the trial court's finding of a potential risk of international abduction of the child by husband, and, therefore, the trial court did not abuse its discretion. We overrule husband's first and second[17] issues.

In his third and fourth issues, husband argues that the trial court improperly divided the community estate, including wife's law practice.

---

[17]Husband's brief argument in support of his second issue is based entirely on his contentions that the trial court erroneously found family violence and a risk of international abduction. Because we have rejected these arguments under his first issue, we do not repeat them under his second issue. *See* TEX. R. APP. P. 47.1.

In dividing the community estate of the parties, the trial court shall order a division of the property that it deems just and right, having due regard for the rights of each party and any children of the marriage.[18] The trial court may order an unequal division of marital property when a reasonable basis exists for doing so.[19] The trial court exercises its broad discretion to divide the marital estate by considering many factors including fault in breaking up the marriage, the nature of the property, wasting of community assets, and child custody.[20]

The trial court's discretion to divide the community estate is not without limit, and there must be some reasonable basis for an unequal division.[21] To prove an abuse of discretion, the complaining party must demonstrate from evidence in the record that the division was manifestly unjust or unfair.[22]

---

[18]TEX. FAM. CODE ANN. § 7.001 (Vernon 2006).

[19]*Massey v. Massey*, 807 S.W.2d 391, 398 (Tex. App.—Houston [1st Dist.] 1991, writ denied).

[20]*Murff*, 615 S.W.2d at 699; *Schaban-Maurer v. Maurer-Schaban*, 238 S.W.3d 815, 820–21 (Tex. App.—Fort Worth 2007, no pet.); *Baccus v. Baccus*, 808 S.W.2d 694, 700 (Tex. App.—Beaumont 1991, no writ).

[21]*Barnard v. Barnard*, 133 S.W.3d 782, 787–89 (Tex. App.—Fort Worth 2004, pet. denied) (reversing slightly unequal property division where trial court did not hold a contested hearing but divided property based on parties' proposed settlement agreements to which neither party agreed); *O'Carolan v. Hopper*, 71 S.W.3d 529, 532 (Tex. App.—Austin 2002, no pet.).

[22]*Pletcher v. Goetz*, 9 S.W.3d 442, 446 (Tex. App.—Fort Worth 1999, pet. denied).

The trial court divided the marital estate[23] as follows:



---

[23]The trial court also concluded that the marital residence, which wife owned before the marriage, was wife's separate property; husband failed to prove any claim for economic contribution or reimbursement; and any and all of husband's property in Bulgaria, $45,000.00 in retirement funds, and a 1993 Toyota Camry were husband's separate property.

**To Wife**

- All household furniture, furnishings, fixtures, goods, art objects, collectibles, appliances, equipment, clothing, jewelry, and other personal effects in the possession or sole control of wife;

- All cash and bank accounts in wife's possession or sole control;

- Wife's Merrill Lynch retirement account;

- All life insurance policies insuring wife's life;

- 1997 Lexus LX4 450 SW;

- 1993 Mercury;

- The business known as Kareneva Law Firm, PLLC, and the debt on the office building.   The building was valued at negative $26,592.85.[24]

- $25,000 money judgment, plus interest, payable by husband to wife;

- Any debts, charge cards, charges, liabilities, and other obligations solely in wife's name, unless otherwise ordered, and all encumbrances, ad valorem taxes, liens, assessments, or other charges due on real and personal property awarded to wife, unless otherwise ordered.

---

[24]The building was appraised at $194,000.00, but the balance due on the note was $220,592.85.

**To Husband**

- All household furniture, furnishings, fixtures, goods, art objects, collectibles, appliances, equipment, clothing, jewelry, and other personal effects in the possession or sole control of husband (and four leather coats in wife's control);

- All cash and accounts in his possession or subject to his sole control;

- Husband's Citigroup, Inc. retirement account;

- All life insurance policies insuring his life;

- 1997 Lexus LS4 400 4D Sedan and the debt thereon;

- Any debts, charge cards, charges, liabilities, and other obligations solely in husband's name, unless otherwise ordered, and all encumbrances, ad valorem taxes, liens, assessments, or other charges due on real and personal property awarded to husband, unless otherwise ordered.

- Husband's toll tag debt.

Several factors support this unequal division. The nature of wife's law practice and its assets and liabilities justified awarding the entire business to wife. Although the parties expended community property on the down payment of the office building, at the time of trial the building was worth *negative* $26,592.85, and the debt on the building was also awarded solely to wife. Husband's argument seems to be that he is entitled to part of the law practice's income.[25] The business's bank accounts, however, contained less than $8,000.00, and it is well

---

[25]Husband claims that the trial court pierced the corporate veil but did not achieve an equitable result. Whether or not the trial court pierced the corporate veil, however, is irrelevant because the trial court awarded all of the company to wife.

settled that the goodwill of a business is generally not considered when placing a value on a professional practice upon divorce.[26]   We conclude that based on the nature of Kareneva Law Firm, the trial court did not abuse its discretion in awarding the entire law practice—assets and liabilities—to wife.

Additionally, the nature of the parties' vehicles supports their division.   Wife asked for the Lexus SUV because it was the car she drove before the separation; it was purchased so she could transport her three children and mother, who lives with her; and, based on its size and safety, she thought it was more suitable for children.   The trial court awarded wife that vehicle and awarded husband the Lexus sedan.   Based on the testimony, the trial court could have concluded that the sedan was considered husband's car before separation, and that the two vehicles were of comparable value.

---

[26] *Nail v. Nail*, 486 S.W.2d 761, 764 (Tex. 1972); *Hirsch v. Hirsch*, 770 S.W.2d 924, 927 (Tex. App.—El Paso 1989, no writ).

In giving wife a money judgment against husband, the trial court could also reasonably have considered several factors. First, wife was awarded significantly more possession of the child than husband. Additionally, husband admittedly spent nearly $70,000.00 from his retirement account ($25,000.00 of which was community property) in paying for his legal fees, including criminal defense and appellate attorney's fees, bond money, divorce case attorney's fees, amicus fees, and payments to the court-appointed social worker and psychiatrist; living expenses throughout the litigation; and start-up costs of his insurance business.

Further, while the parties did not plead a fault ground for divorce, much of the trial was devoted to husband's, and to some extent wife's, misconduct; thus, the issue of fault was tried by consent.[27] Accordingly, the trial court may have considered husband's fault in breaking up the marriage when it divided the marital property slightly in favor of wife. The evidence showed that husband threatened or harassed wife by email, letter, and voice mail; twice followed her in his car; photographed one of her clients outside of her law office and demanded $100,000.00 not to release the photograph; admittedly failed to pay any child support throughout the proceeding; initiated a CPS case against wife despite child's innocent explanation for a bruise; falsely told the court-appointed

---

[27] *See* TEX. R. CIV. P. 67; *Schneider v. Schneider*, No. 02-02-00075-CV, 2004 WL 254247, at *2 (Tex. App.—Fort Worth Feb. 12, 2004, pet. dism'd) (mem. op.).

psychiatrist that wife was involved in witchcraft; and initially denied owning any assets in Bulgaria.

For all these reasons, we conclude that the trial court did not abuse its discretion in dividing the marital estate as it did, and husband has not demonstrated from evidence in the record that the division was manifestly unjust or unfair. Accordingly, we overrule husband's third and fourth issues.

In his fifth issue, husband challenges the trial court's child support findings.

The duty to support a child is not limited to a parent's ability to pay from current earnings but extends to his financial ability to pay from any and all sources that might be available.[28] If a parent's actual income is significantly less than what he or she could earn because of intentional underemployment or unemployment, the trial court may apply the child support guidelines to that parent's earning potential.[29]

---

[28] *In re Z.B.P.,* 109 S.W.3d 772, 783 (Tex. App.—Fort Worth 2003, no pet.).

[29] TEX. FAM. CODE ANN. § 154.066 (Vernon 2002); *Logan v. Logan*, No. 02-05-00068-CV, 2006 WL 2167164, at *6 (Tex. App.—Fort Worth Aug. 3, 2006, pet. denied) (mem. op.).

For a trial court to find that a parent is intentionally underemployed or unemployed, there must be evidence that the parent reduced his or her income for the purpose of decreasing child support payments.[30]   There is no presumption of intentional underemployment simply because the divorced obligor earns less than he did when he was married to the obligee.[31]   The requisite intent to be underemployed for the purpose of decreasing child support payments may be inferred from such circumstances as the parent's education, economic adversities and business reversals, business background, and earning potential.[32]

---

[30]*Logan*, 2006 WL 2167164, at *6.

[31]*Id.*

[32]*Z.B.P.*, 109 S.W.3d at 783; *In re P.J.H.,* 25 S.W.3d 402, 406 (Tex. App.—Fort Worth 2000, no pet.).

19

The trial court found husband was voluntarily underemployed and ordered him to pay child support of $1,050.00 per month based on an earning potential of $6,000.00 per month.[33]   Husband testified that he had been employed as a program manager in the computer field, earning approximately $10,000.00 per month, or $120,000.00 per year, plus a yearly bonus of approximately $25,000.00. Although he was laid off in late 2003, his salary continued until February 2004, and he could have elected to remain with the company in a different capacity but declined to do so.[34]   After being laid off, husband unsuccessfully looked for work before deciding to help wife with her law practice.[35]   After the parties separated in late 2004, husband eventually found employment in June 2005 as an independent insurance agent where he, at the time of trial, earned $600.00 per month.[36] Husband explained that he could not find a job in his field because many of the computer jobs were outsourced overseas and because of his criminal conviction,

---

[33]Husband was also paying child support for one other child.   See TEX. FAM. CODE ANN. §§ 154.126(a), 154.129 (Vernon 2002) (providing method of calculating husband's child support obligation).   Although section 154.126 was recently amended, the instant suit commenced before September 1, 2007 and is, therefore, governed by the old version.   Id. § 154.126 historical note (Vernon Supp. 2007) [Act of May 22, 2007, 80th Leg., R.S., ch. 620, § 7, 2007 Tex. Gen. Laws 1188, 1190].

[34]The record does not disclose the salary of the other position.

[35]Husband claimed that he worked as wife's "office manager," but wife denies he did anything other than set up the server and paint the office building.

[36]The amicus argued that this is less than minimum wage.

and he expected that his earnings would increase as his business developed. Despite this meager income, husband stated that his monthly expenses were $9,919.00.

We conclude that there is some probative and substantive evidence supporting the trial court's express finding that husband was underemployed and had an earning potential of $6,000.00 per month.[37] We, therefore, hold that the trial court did not abuse its discretion by ordering husband to pay $1,050.00 per month in child support,[38] including unpaid temporary child support. We overrule this part of husband's fifth issue.

Husband also challenges the trial court's award of $15,750.00 in unpaid temporary child support. Although husband acknowledges that the trial court ordered him to pay temporary child support as of September 9, 2005, he argues that the award was improper because, among other reasons, the trial court never specified the amount to be paid during the proceedings, the trial court conditioned the amount of temporary child support on husband's actual income, and the time

---

[37] *See* TEX. FAM. CODE ANN. § 154.066 ("If the actual income of the obligor is significantly less than what the obligor could earn because of intentional . . . underemployment, the court may apply the support guidelines to the earning potential of the obligor.").

[38] We disagree with appellant's contention that the trial court deviated from the family code's percentage guidelines in setting the amount of child support. *See id.* §§ 154.126(a), 154.129 (providing that husband, who was also paying child support for one other child, pay 17.50% of $6,000.00 per month, or $1,050.00). *See supra* note 33.

from the date child support was ordered to be paid to the time of trial was only nine months, rather than fifteen.

In the order establishing the temporary child support obligation, the trial court ordered husband to produce financial records and paycheck stubs to wife's attorneys by a certain date. The order further provided, "Once [husband] produces his income information and the amount of child support is determined by this Court, [husband] shall begin making the determined amount of child support payments immediately . . . ." There is no indication that husband produced his financial information or that the court later set a specific amount of temporary child support.

While the order did not specify an amount to be paid, it clearly obligated husband to pay some amount of child support, a fact husband admitted at trial. Husband acknowledged that he failed to pay any child support. We agree with husband, however, that he should not have been ordered in the decree to pay unpaid temporary child support based on fifteen months of nonpayment.[39] The temporary order provided that child support be paid as of September 9, 2005. The final decree of divorce nunc pro tunc states that regular child support payments began June 1, 2006. Thus, we conclude that husband should have

---

[39]The sum awarded by the trial court, $15,750.00, divided by a monthly payment of $1,050.00, equals fifteen, indicating that the sum awarded represented fifteen months of nonpayment.

been required to pay back due child support for only nine months, for a total of $9,450.00.

We sustain this part of husband's fifth issue.

Finally, husband argues that the trial court improperly ordered him to pay $10,000.00 of wife's attorney's fees for "pursuing unpaid child support" and $14,619.25 in amicus fees, and ordered that both sums were "in the nature of and enforceable as child support."

To preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling, if they are not apparent from the context of the request, objection, or motion.[40] If a party fails to do this, error is not preserved, and the complaint is waived.[41]

---

[40]TEX. R. APP. P. 33.1(a); *see also* TEX. R. EVID. 103(a)(1).

[41]*Bushell v. Dean*, 803 S.W.2d 711, 712 (Tex. 1991) (op. on reh'g).

Husband's attorney did not object or otherwise apprise the trial court of his opposition to the attorney's or amicus fees being enforceable as child support. Further, husband did not file any post-trial motion—such as a motion for new trial or motion to amend or correct the judgment—that complained of the characterization of the awards. [42] Accordingly, husband has waived his complaints regarding wife's attorney's fees and amicus fees being enforceable as child support. We overrule these complaints.

We overrule appellant's first, second, third, and fourth issues. We also overrule appellant's fifth issue, except as it relates to unpaid temporary child support. With regard to that finding only, we reverse that part of the trial court's decree ordering husband to pay unpaid temporary child support in the amount of $15,750.00 and render judgment ordering husband to pay unpaid temporary child support in the amount of $9,450.00. We affirm the rest of the trial court's judgment.

PER CURIAM

---

[42] *Cf. Keith v. Keith*, 221 S.W.3d 156, 173 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (holding that complaint regarding award of post-judgment interest must be preserved by a motion to amend or to correct the judgment or by a motion for new trial); *Miller v. Kendall*, 804 S.W.2d 933, 945 (Tex. App.—Houston [1st Dist.] 1990, no writ) (holding that motion to amend or to correct judgment or motion for new trial is proper vehicle for preserving error in judgment); *WLR, Inc. v. Borders*, 690 S.W.2d 663, 665, 668–69 (Tex. App.—Waco 1985, writ ref'd n.r.e.) (same, in bench trial).

PANEL A:   CAYCE, C.J.; DAUPHINOT and GARDNER, JJ.

DELIVERED:   March 20, 2008