COURT OF APPEALS

                                         SECOND
DISTRICT OF TEXAS

                                                      FORT
WORTH

 

 

                                           NO.
2-07-298-CV

 

 

BRIAN E. HENDERSHOT                                                        APPELLANT

 

                                                      V.

 

HEATHER L. HENDERSHOT                                                      APPELLEE

 

                                                  ------------

 

             FROM THE 324TH
DISTRICT COURT OF TARRANT COUNTY

 

                                                  ------------

 

                                  MEMORANDUM OPINION[1]

 

                                                  ------------

I. Introduction

In four points, Appellant Brian Hendershot
appeals from the trial court=s
judgment in his suit for divorce against Appellee Heather Hendershot,
complaining that the trial court erred in its division of the parties=
community estate.  We affirm.








II. Factual & Procedural History

The parties married in December 2001.  Brian filed for divorce a little less than
three years later, in October 2004, alleging only that the marriage had become
insupportable because of discord or conflict of personalities.  However, by the filing of his third amended
original petition in 2007, Brian additionally alleged that Heather was at fault
in the marriage=s break-up and sought a
disproportionate division of the community estate because of fault, her alleged
waste of community assets, and the loss of the benefits he would have received
from the marriage=s continuation.  Heather filed a counterpetition for divorce,
seeking a disproportionate division of the community estate based on Brian=s sale
of portions of the business purchased by the parties during marriage and breach
of fiduciary duty.








During the two-day trial, the trial court heard
testimony from the parties about themselves and their assets.  The trial court signed the divorce decree on
June 1, 2007, dissolving the marriage on the ground of insupportability.  The trial court divided the community estate,
the value of which the parties had estimated between $1,081,790 and $1,114,643;
however, because the trial court did not make any valuation findings, we do not
know the percentage share of the marital estate each party received.  Brian filed a motion for new trial in July
2007, which the trial court denied after a hearing.  This appeal followed.

III. Standard of Review

A trial court has broad discretion in making its Ajust and
right@
division of the marital estate.  Tex.
Fam. Code Ann. ' 7.001 (Vernon 2006); Murff
v. Murff, 615 S.W.2d 696, 698_99 (Tex. 1981).  Absent a clear abuse of discretion, we will
not disturb that division.  Bell v.
Bell, 513 S.W.2d 20, 22 (Tex. 1974); Boyd v. Boyd, 67 S.W.3d 398,
406 (Tex. App.CFort Worth 2002, no pet.).    








To determine whether a trial court abused its
discretion, we must decide whether the trial court acted without reference to
any guiding rules or principles;  in
other words, we must decide whether the act was arbitrary or unreasonable.  Downer v. Aquamarine Operators, Inc.,
701 S.W.2d 238, 241_42 (Tex.
1985), cert. denied, 476 U.S. 1159 (1986).  We must indulge every reasonable presumption
in favor of the trial court=s proper
exercise of discretion in dividing marital property.  Boyd v. Boyd, 131 S.W.3d 605,
610 (Tex. App.CFort Worth 2004, no pet.).  Accordingly, we will reverse only if the
record demonstrates that the trial court clearly abused its discretion and the
error materially affected the just and right division of the community estate.  Id.; see also Schaban‑Maurer
v. Maurer‑Schaban, 238 S.W.3d 815, 820 (Tex. App.CFort
Worth 2007, no pet.).

When an appellant challenges a property division,
we will first determine whether the trial court had sufficient evidence upon
which to exercise its discretion before evaluating whether the trial court
abused that discretion.  Boyd, 131
S.W.3d at 610; In re T.D.C., 91 S.W.3d 865, 872 (Tex. App.CFort
Worth 2002, pet. denied) (op. on reh=g).  An abuse of discretion does not occur where
the trial court bases its decisions on conflicting evidence.  In re Barber, 982 S.W.2d 364, 366
(Tex. 1998) (orig. proceeding). 
Furthermore, an abuse of discretion does not occur as long as some evidence
of substantive and probative character exists to support the trial court=s
decision.  See Butnaru v. Ford Motor
Co., 84 S.W.3d 198, 211 (Tex. 2002). 
Our role in reviewing cases where property is divided in a divorce
action is to determine only if there is an abuse of discretion in the property
division, and if there is, to remand the case to the trial court.  See McKnight v. McKnight, 543 S.W.2d
863, 866 (Tex. 1976); see also Tex. Fam. Code Ann. ' 7.001.   

IV. Discussion








Generally, Brian complains that the trial court
divided the community property Ain a
manner that placed between 86[%] and 92% of the community estate@ with
Heather.  Within that context, he has
four specific complaints about the trial court=s
property division: the trial court=s
assessment of the value of a Anon-solicitation@
contract to him and its failure to consider his fault grounds; the trial court=s
allocation of Heather=s stock options and 401(k)
entirely to Heather; and the award to Heather of $10,830 as her separate
property.

A. Community Property Division Factors

In exercising its discretion, the trial court
must order an equitable, but not necessarily equal, division of the community
estate.  Tenery v. Tenery, 932
S.W.2d 29, 29B30 (Tex. 1996); Taylor v.
Taylor, No. 02‑05‑00435‑CV, 2007 WL 2460359, at *9 (Tex.
App.CFort
Worth, Aug. 31, 2007, pet. denied) (mem. op.). 
In dividing the estate, the trial court can consider a variety of
factors, and it is presumed that the trial court exercised its discretion
properly.  Bell, 513 S.W.2d at 22;
Campbell v. Campbell, 625 S.W.2d 41, 43 (Tex. App.CFort
Worth 1981, writ dism=d).

Some of the factors the trial court may consider
include the spouses= capacities and abilities,
business opportunities, education, relative financial condition and
obligations, size of the separate estates, and the nature of the property.  Schaban‑Maurer, 238 S.W.3d at
820_21; Murff,
615 S.W.2d at 699.  It may also consider
the wasting of community assets.  See
Schlueter v. Schlueter, 975 S.W.2d 584, 589 (Tex. 1998).








B. General Testimony by the Parties 

1. Brian=s
Financial Status and Assets

Brian testified that he had a bachelor=s degree
in business administration and had worked in various capacities, including
managing inventory control and accounts payable for ten years; he had also been
the chief operating officer (COO) and chief financial officer (CFO) of a small,
privately-held gourmet food-and-gift company for three years before becoming
CFO of TuneUp Masters in April 1998.  He
became TuneUp Masters=s President/CEO/CFO in early
2000. During the first year of his marriage with Heather, he was also the CFO
of a small chain of wedding photography studios.

Brian testified that, on August 29, 2003, he and
Heather acquired TuneUp Pro, L.L.C. and that it was held only in his name.  He also testified that he owned 100% of TUM
Flight Services, which owned the small, four-seat airplane that he used to
travel for work.








The parties testified about how Brian acquired
the company from a venture capital firm Afor
basically all paper@C$150,000
in cash and a note for $4.6 million. 
Brian testified that the reason he bought TuneUp Masters was Ato buy a
job@Cthat is,
to put less than one year of his salary at risk to keep his job because he felt
that TuneUp Masters would operate for more than a year. By trial, he had
received over $630,000 in salary since the purchase.  He also testified that, since July 2004,
TuneUp Masters had not been solvent.

In December 2005, Brian sold the California and
Nevada TuneUp Masters locations to Auto Life Acquisition for $2.8 million, in
the form of $1.5 million in cash and $1.3 million in a sixty-day note secured
by the TuneUp Masters assets in those locations.  He testified that Auto Life defaulted on its
$1.3 million note and that he opted to not foreclose on the note.[2]  He subsequently entered into an agreement to
sell the rest of the company to Auto Life because Ait was
the only way out.@ 
He testified that Auto Life had issued a letter of intent in June 2006
with regard to the sale, that the deal had been in the works since July 2006,
and that, if the deal did not close, TuneUp Masters would likely go
bankrupt.  He testified that he had
continued to draw a salary every month because declining to take his salary
would not have saved the business.








Brian testified that, if the sale went through,
he would be out of a job, and if the sale did not go through, the company would
probably go bankrupt and he would still be out of a job.  He also testified that, if the sale went
through, AI am supposed to get one hundred
thousand dollars per year for three years in exchange for not working in the
industry and not hiring any of my currentCor,
anybody that=s been employed by TuneUp
Masters in the last twelve months.@  The trial court admitted the letter
containing the nonsolicitation agreement. 
When asked about his plans after the TuneUp Masters sale, Brian
testified, AFind another job.  Hopefully buy another company.  I=m not
sure.@

Donald V. Latin, Brian=s
valuation expert, testified that the value of TuneUp Masters as of December 31,
2005, was $0.  Bryan Charles Rice, Heather=s
valuation expert, agreed.  When asked if
Heather should be upset with him Ato the
tune of a loss of a million three@ or for
taking Aa
company that was not in financial difficulty at the time of marriage and is now
worth zero,@ Brian replied, ANo.@








Brian testified that, before marriage, he owned
the house and furnishings and had a rollover IRA from a previous employer, two
investment accounts, a fully-paid-for Jeep Wrangler, and a Mercedes.  He testified that he sold the Jeep in 2004
for $16,000, deposited the money into his Bank of America account, and
transferred it to his Mead Capital Reserve account.  He testified that he paid $325,000 for the
house and that it had first and second mortgages, payments to which were made
during the marriage.  He testified that
he put the house on the market in April 2006 and that its current value was
around $440,000.  He still owed $281,410
on the mortgage, down from $307,000 at the start of the marriage.

By the time of trial, Brian had a Chevrolet Tahoe
worth around $16,430, carrying a debt of $13,259.  He testified the he traded the Mercedes in on
the Tahoe at a loss.  He testified that
he, through TuneUp Masters, bought the airplane for $78,000 in January 2004 and
sold it to TUM Flight Services L.L.C. for $1.00 and that TuneUp Masters began
paying a fixed fee to TUM Flight Services to maintain the plane; he was the
only individual within TuneUp Masters who operated the plane.  Brian bought a Harley Davidson motorcycle in
May 2005 for $15,000.  He neglected to
include TUM Flight Services, the airplane, or the motorcycle on his initial
inventory, but he testified that this was an oversight.  Brian testified that $25,294 of the
$34,321.64 in his 401(k) was community property.

2. Heather=s
Financial Status and Assets

Heather testified that she had been with Texas
Instruments (TI) for almost fifteen years, and had been there for around ten
years before she and Brian married.  By
trial, she was an engineering operations manager; she testified that she
usually made less money than Brian.








Heather earned an executive MBA degree during
marriage.  Brian testified that after she
got the MBA, she wanted to quit her job and do volunteer work and that her
desire to quit working lasted throughout 2003 and 2004.  Heather testified that Brian told her that he
would make a million dollars a year from TuneUp Masters once the note was paid
off.  Brian testified that he did not
tell her that or tell her that she would be able to do other things.  Heather testified that at the time the
parties married, she had a house and a vehicle; by trial, she had her vehicle,
other personal property in her possession, her TI stock options, her 401(k),
and her bank accounts.  Some of her TI
stock options were awarded to her prior to marriage, with an estimated value of
$309,945.

3. Community Expenses &
Proposed Divisions

The parties disputed who paid most of the
community expenses during the marriage and who was responsible for the most
waste of community assets.  Brian
characterized Heather=s charitable contributions in
2005 of $20,766 and in 2006 of $27,191 as waste.[3]  Heather testified that she did not think that
Brian managed TuneUp Masters appropriately, stating that Athe
biggest thing is forgiving a million-dollar debt.@








Brian testified that he should be awarded 60% of
the community estate because he felt that Adefault
[sic] of the marriage was caused by [Heather=s]
erratic behavior, and therefore, you know, I=ve given
up future potential for us to build a life together and the financial rewards
that that encompassed.@ 
Specifically, he asked for the trial court to award him his car and its
related debt, the Bank of America and Mead accounts, $45,000 from Heather=s
savings account, 46% of Heather=s TI
stock options (or $300,000 of his expert=s
$650,000 valuation), $175,000 from Heather=s
401(k), the community economic contribution to the house, the airplane, the
motorcycle, and $33,000. He testified that his separate estate was worth
$229,000, and that Heather=s
separate estate was worth $658,000.

Heather=s
proposed property division exhibit showed that her separate estate was worth
approximately $191,139.  Accounting for
the separate property TI stock options, her separate estate amounts to around
$501,084.  Heather stated that, if the
trial court felt it necessary to move money around, she would prefer that it
take the money from her 401(k) because she would Arather
not have to deal with ten years of [Brian] asking [her] to exercise the stock.@  The exhibit containing her summary of
testimony and proposal for division of the community estate was admitted
without objection.  Both parties
requested attorney=s fees; by the time of trial,
Brian had spent $36,034 in attorneys= fees,
and Heather=s bill for attorneys= fees
was around $31,625.

The trial court assigned the following property
to each party:








$               
All household furniture, furnishings, fixtures, goods, art objects,
collectibles, appliances, equipment, all clothing, jewelry and other personal
effects in his or her possession or subject to his or her sole control.

 

$               
All sums of cash in his or her possession or subject to his or her
control, including funds on deposit together with accrued but unpaid interest,
in banks, savings institutions, or other financial institutions, which accounts
stand in his or her sole name, from which he or she has the sole right to
withdraw funds, or from which he or she has sole control.

 

$               
The sums, whether matured or unmatured, accrued or unaccrued, vested
or otherwise, together will all increases thereof, the proceeds therefrom, and
any other rights related to any profitsharing plan, retirement plan, Keogh
plan, pension plan, employee stock option plan, 401(k) plan, employee savings
plan, accrued unpaid bonuses, disability plan, or other benefits existing by
reason of his or her past, present, or future employment. 

 

$               
One‑half to each party of any future refund for the overpayment
of taxes for any year during the parties= marriage through December 31, 2004.  

 








The trial court awarded to Brian the 2003
Chevrolet Tahoe and the 2004 Harley Davidson motorcycle, together with all
prepaid insurance, keys, and title documents. 
It awarded to Brian all interest in TuneUp Masters, Inc.; TUM Holdings,
Inc.; Tuneup Pro, LLC; and TUM Flight Services, LLC; including but not limited
to all furniture, fixtures, machinery, equipment, inventory, cash, receivables,
accounts, goods, and supplies, all personal property used in connection with
the operation of the business; and all rights and privileges past, present, or
future, arising out of or in connection with the operation of the
business.  The trial court also awarded
to Brian, A[a]ny and all proceeds Brian may
receive from the sale of the TuneUp Masters business, including specifically
but not necessarily limited to the $100,000 per year he may receive for three
(3) years for not soliciting any of the current employees.

The trial court confirmed the following as Brian=s separate
property: the marital residence, including any economic contribution that the
community estate was entitled to; and all sums in the Mead Credit Union
accounts (less $10,830 to Heather), the Linsco IRA rollover account, the Linsco
brokerage account, and the Putnam account, including any community interest
that Heather might have therein.[4]


The trial court awarded to Heather the sum of
$10,830 payable from Brian=s
Homeland Capital Reserve account, formerly Mead Capital account, to represent
the remaining proceeds in that account arising from the sale of Heather=s
separate property residence, and all Texas Instruments stock options granted to
her during the marriage, the value of which Heather estimated to be $241,748
and Brian estimated to be $652,759.  The
trial court also confirmed Heather=s BMW as
her separate property.

 








C.  The ANon‑solicitation
Contract@ and Fault Grounds

In his first point, Brian contends that the trial
court abused its discretion by assessing a value of $300,000 to the Anon‑solicitation
contract@
contained in a legally unenforceable letter of intent, which he claims was
further mischaracterized by the trial court as a sales contract and resulted in
a manifestly unfair division of the community estate.  In this same point, Brian also complains that
Athe
great weight and preponderance of the evidence showed that the fault of the
break up of the marriage was with Heather,@
claiming that a division of the community estate in Heather=s favor
was not supported by the evidence and that a division in his favor was.

1. The Nonsolicitation Contract

An executed copy of the Anon-binding
letter@
outlining Auto Life=s intention to purchase TuneUp
Masters, admitted into evidence by the trial court,  states,

4.      Non-Solicitation
Agreement.

 

As a condition to the closing of the Transaction, Brian Hendershot
shall enter into a three (3) year non-solicitation agreement whereby [he] shall
not, directly or indirectly, engage, employ or solicit the employment of any
person who is then or has been within twelve (12) months prior to the time of
such action, an employee of [TuneUp Masters]. 
Brian Hendershot shall receive compensation over the three years of the
non-solicitation period at $100,000 per year, paid monthly pro-rata.

 








The letter also includes the following: AThis
Letter of Intent shall terminate ten (10) days following the receipt by a party
of a written notice of termination from the other party, or August 29, 2006, whichever
occurs first.@ 
The parties= trial was held from February
28, 2007, to March 1, 2007.

During trial, Brian testified that he Aabsolutely@ had
concerns about whether or not he would actually receive anything from Auto Life
after the sale, since it had defaulted on the note.  To that end, he testified that he had asked
for half of the noncompete payment to be escrowed when the sale closed and that
he was going Ato ask for it to be paid on
every other month, half from them and half from the escrow.@  He testified that a purchase agreement that
was still being negotiated would come after the letter of intent and that, by
trial, Auto Life still had to finish working up their financials to get the
loan to buy TuneUp Masters, but that they were in the closing process.  He added, AWell, I=m
hopeful we=ll close.@

During closing arguments, Brian=s attorney
presented the issue of whether Brian would actually receive the $300,000 firmly
before the trial court, stating:








Is there a question about whether or not he will
get that money [$300,000] in the future? 
Absolutely.  You heard his testimony.  He=s trying
to negotiate to get half of it escrowed because he doesn=t trust
the people.  The best evidence of whether
or not to trust those people about honoring their obligations is how they
defaulted on a one-point-three-million-dollar note last year.  That=s why
the current sale is an all-cash deal. . . . And I think that giving her 91
percent of the community estate, which is the way it looks to us, would be
grossly unfair.  We believe the Court, in
looking at the totality of the circumstances, Your Honor, will come to the
conclusion that the community estate should be divided disproportionately in
favor of Brian Hendershot.

Neither party pointed out to the trial court that the letter, by its
own terms, had expired; however, because it was admitted into evidence, the
trial court had the letter before it when it made its property division.

2. Fault

The parties=
testimonies differed with regard to Brian=s fault
grounds: a vasectomy he claimed Heather insisted upon, her subsequent tubal
ligation, Aher ranting and raving and
threatening to kill@ him, and her unauthorized
writing of a check on his account.








Specifically, the trial court heard testimony
both that Heather forced Brian to have a vasectomy and that the parties
discussed the vasectomy and agreed to it for the benefit of Heather=s
health.  Brian testified that Heather
forged his name on a $1,000 check to contribute to a family purchase of a car
for her mother, but Heather testified that Brian gave her permission to write
that check on his account; Brian also testified that Heather threatened
physical harm to him one night in 2004; Heather testified that she did not
recall the incident and did not believe that it happened and that Brian was
lying.  She testified that Brian never
brought up concerns about the vasectomy, the $1,000 check, or her alleged
abusive or violent behavior in marriage counseling.

3. Analysis

The trial court had sufficient evidence upon
which to exercise its discretion and could have reasonably concluded that
Heather was not at fault for the marriage=s break
up.  And because an abuse of discretion
does not occur when the trial court bases its decision on conflicting evidence,
as here, we cannot conclude that the trial court abused its discretion by
disregarding Brian=s alleged fault grounds.  See Barber, 982 S.W.2d at 366.  We overrule this portion of Brian=s first
point.








Based on the parties=
testimonies, the trial court was entitled to conclude that the parties=
capacities, abilities, and education were similar and to divide the community
estate accordingly.[5]  See Schlueter, 975 S.W.2d at 588; Murff,
615 S.W.2d at 699; Schaban‑Maurer, 238 S.W.3d at 820_21.  Brian testified that he intended to possibly
buy another business, and the trial court could have considered, based on Brian=s
testimony, that his relative financial condition, particularly with regard to
the size of his separate property estate, even excluding the $300,000
nonsolicitation agreement, did not require a disproportionate allocation of
community property in his favor.  Murff,
615 S.W.2d at 699; Schaban‑Maurer, 238 S.W.3d at 820_21.  

Furthermore, the trial court could consider
testimony about the waste of community assets. 
 Schlueter, 975 S.W.2d at
588B89.  The trial court issued temporary orders on
June 15, 2005, enjoining the parties from A[d]estroying,
removing, concealing, encumbering, transferring, or otherwise harming or
reducing the value of the property of one or both of the parties.@ Brian
characterized Heather=s charitable contributions
totaling $47,957  as waste, but during
the same time period, Brian acquired the motorcycle for $15,000 and waived Auto
Life=s $1.3
million default on its note to TuneUp Masters. 
Therefore, the trial court could have concluded that any waste of
community assets by Heather was cancelled out or exceeded by Brian=s own
waste and that it should be counted against him in the property division.








The trial court heard testimony about the
potential for the $300,000 nonsolicitation agreement to fall through and heard
closing argument that specifically pointed this out.  The trial court=s order
stated that Brian=s property included A[a]ny
and all proceeds [Brian] may receive from the sale of the TuneUp Masters
business[,] including specifically but not necessarily limited to the $100,000
per year he may receive for three (3) years for not soliciting any of
the current employees.@ [Emphasis added.]  Although Brian complains that the trial court
misconstrued the letter of intent in its letter of rendition as a legally
enforceable right, the trial court specifically stated, with regard to the $300,000,
that it considered it community property Aif
received according to the proposed contract,@ meaning
the proposed sales contract that was supposed to follow the letter of intent,
and which Brian testified was still under negotiation.

Furthermore, the trial court pointed out during
the hearing on Brian=s motion for new trial:

I recall the testimony that it was certainly not a surety that [the
$300,000] was going to come in, and, in fact, [Brian] . . . was very clear, and
I think [Brian=s attorney] made it very
clear, that it was certainly more than a possibility it might not come in. . .
. And, in fact, in my rendition, I did state Aif received.@ 

 

. . . . I considered all the evidence about TuneUp Masters, about this
three-hundred-thousand-dollar possible agreement not to solicit the employees.
. . . The problem at the time was two of the major assets of . . . these
parties, was one, the TuneUp Masters and the possible
three-hundred-thousand-dollar agreement, and the other was the stock
options.  

 








Again, it seems to me like it could have gone exactly the other
way.  This agreement may have come in.
[Brian=s] ship may have come in
and he had three hundred thousand dollars in his pocket.  Her stock options could have gone totally
down the drain and she would have nothing. 

 

The trial court clearly considered the $300,000 nonsolicitation
agreement as nothing more than a potential benefit when it awarded it to
Brian.  

Brian=s own
calculations presented to the trial court that he was responsible for 8.88% of
the community estate and that Heather was responsible for 91.12%; he proposed a
division awarding to him 60% based only on her Aerratic
behavior@ and on
no other theory.  Because we must presume
that the trial court exercised its discretion properly, and because the trial
court had the discretion to consider all of the above factors and more in its
division of the community estate, we hold that the trial court did not abuse
its discretion by choosing to believe Heather=s
testimony over Brian=s with regard to fault, and by
accounting for and including the $300,000 nonsolicitation agreement that, at
the time of trial, Brian might have received, in its overall division of the
community estate.  See Bell,
513 S.W.2d at 22.  We overrule the
remainder of Brian=s first point.

D. Stock Options and
Heather=s 401(k)








In his second point, Brian complains that the
trial court erred by not dividing Heather=s stock
options in kind, claiming that valuation testimony showed a huge potential
fluctuation in values.  In his fourth
point, he argues that the trial court erred by awarding to Heather all of her
401(k) savings plan and all of her savings account.  He asserts that both errors Aresulted
in a grossly unfair division of the community estate.@








Texas courts have consistently held that stock
options acquired during marriage are a contingent property interest and a
community asset subject to division upon divorce.  Boyd, 67 S.W.3d at 410; Kline v. Kline,
17 S.W.3d 445, 446B47 (Tex. App.CHouston
[1st Dist.] 2000, pet. denied).  The
family code sets out that, in a divorce decree, the trial court shall determine
the rights of both spouses to stock options or other employer plans Ain the
nature of compensation or savings.@  Tex. Fam. Code Ann. ' 7.003; see
also id. ' 3.007(d) (Vernon 2006)
(describing the formula for the division of stock options between community and
separate estates).[6]  However, there is nothing in the code or case
law with regard to the proper method of stock option valuation.  Cf. Boyd, 67 S.W.3d at 411.  The trial court has the discretion to award
retirement benefits earned during marriage to the party who earned them.  Schaban‑Maurer, 238 S.W.3d at
820_21.  Funds in a savings account that were earned
during marriage are community property, subject to the trial court=s just
and right division.  See Tex. Fam.
Code Ann. '' 3.002, 7.001.

1. Stock Options








With regard to the value of Heather=s TI
stock options, the parties stipulated that the value of TI stock the day before
trial was $30.67 a share, and their experts presented dueling valuation
methodologies.  Heather=s
expert, Rice, testified that he used the intrinsic value method, which involves
Ataking
the fair market value of the stock that is represented by the option, and then
. . . subtract[ing] from that the strike price [the price at which the option
can be exercised],@ and that the intrinsic value is
calculated from the differential multiplied by the number of options that are
available.  He testified that the Black
Scholes option pricing method recommended by Brian=s expert
was typically used to value European-style stock options, which can only be
exercised on their expiration date, and to value publicly-traded options, and
that Heather=s TI options were American-style
options, which can be exercised at any time after the vesting date and prior to
the expiration date, that they were not publicly traded, and that they were
non-transferable.  He also described the
Black Scholes model as requiring assumptions about volatility for a
hypothetical exercise date, calling it Aa
subjective determination@ with regard to the stock=s
volatility.  He testified that the
intrinsic value method eliminates a lot of the uncertainties presented by the
Black Scholes model.

Rice testified that, using the intrinsic value
method, the community value of the options that were available was $219,975,
before income tax.  He testified that
some of the options had strike prices in excess of the current stock market
value so that it would be pointless to exercise the option, and he valued those
options at $0.

Brian=s
expert, Latin, testified that Heather=s stock
options should be valued using the Black Scholes model.  He testified that in valuing stock options, A[p]eople
are willing to buy options that are . . . under water, the exercise price is
above the market price, they will pay something for that because, during the
term of the warrant, they have an opportunity to exercise@ and A[t]he
more volatile the stock is, the more valuable the option is.@  He testified that the Black Scholes method
was better, Abecause it shows what a  theoretical value of an option is, rather
than just looking at it today.@








Latin testified that, assuming a price of $30 a
share, based on the Black Scholes method, the community value of Heather=s stock
options was $585,174, and assuming a price of $32.21, the community value would
be $652,759Cthe amount Brian listed in his
proposed division of the parties=
assets.  He testified that Heather=s
options were not transferable but that the Black-Scholes methodology would still
apply even if no one else could buy her options.  Heather testified that she would have to stay
employed with TI to keep her options.

2. Heather=s 401(k)
and Savings Account

Heather testified that, as of trial, her 401(k)
contained $352,436, of which $199,057 was community property and $153,379 was
her separate property.[7]  Heather also testified that she did not have
substantial savings in her savings account until February 2005, when she
received her bonus from TI, which increased her account by $50,000.  She also testified that the bonus was not
guaranteed, but was based on both her performance and the company=s
performance.

3. Analysis








Brian asserts that, A[i]n
dealing with such sharply differing testimony concerning the value of the
options, the prudent thing for the [t]rial [c]ourt to do [was] to divide the
options between the parties@ and
that it was an abuse of discretion not to do so.  However, the trial court had the option to
believe either Rice or Latin with regard to the value of the stock options, and
then to divide or not divide the stock options accordingly.  Assuming that the trial court favored Rice=s
valuation and taking into consideration the evidence at trial on the other
factors that the trial court had the discretion to consider in dividing the
community estate, previously addressed above, we cannot say that its allocation
of all of the stock options to Heather was so arbitrary and unreasonable as to
amount to a clear abuse of discretion.  See
Downer, 701 S.W.2d at 241_42; Boyd, 131
S.W.3d at 610.

Furthermore, with regard to the trial court=s
allocation to Heather of her entire 401(k) and her savings account, based on
the testimony at trial, the parties=
proposed division of assets, and the factors that the trial court could consider
in reaching an equitable division, we cannot say that the trial court=s
allocation here was unreasonable or arbitrary either.  See Schaban-Maurer, 238 S.W.3d at 820_21. Therefore, we
overrule Brian=s second and fourth points.

E. Heather=s
Separate Property

In his third point, Brian argues that the trial
court erred by awarding to Heather $10,830 in the Homeland Capital Reserve
Account (formerly the Mead account) as her separate property, without any
evidence of tracing from Heather and Adespite
clear testimony that any of her separate property in the account had been withdrawn.@








We note first that the trial court=s final
divorce decree stated that the $10,830 from the Mead account Arepresent[ed]
the remaining proceeds@ of the
sale of Heather=s separate property residence,
and not that they were the actual separate property proceeds. [Emphasis
added.]  Furthermore, our courts have
found no difficulty in following separate funds through bank accounts.  See Welder v. Welder, 794 S.W.2d 420,
425 (Tex. App.CCorpus Christi 1990, no writ); Sibley
v. Sibley, 286 S.W.2d 657, 659 (Tex. Civ. App.CDallas
1955, writ dism=d).  A showing that community and separate funds
were deposited in the same account does not divest the separate funds of their
identity and establish the entire amount as community when the separate funds
may be traced and the trial court is able to determine accurately the interest
of each party.  Welder, 794 S.W.2d
at 425; Holloway v. Holloway, 671 S.W.2d 51, 60 (Tex. App.CDallas
1983, writ dism=d).  One dollar has the same value as another, and
under the law there can be no commingling by the mixing of dollars when the
number owned by each claimant is known.  Welder,
794 S.W.2d at 425; Trawick v. Trawick, 671 S.W.2d 105, 110 (Tex. App.CEl Paso
1984, no writ).  








When separate funds can be traced through a joint
account to specific property purchased with those funds, without surmise or
speculation about funds withdrawn from the account in the interim, then the
property purchased is also separate.  See
McKinley v. McKinley, 496 S.W.2d 540, 543_44 (Tex. 1973).  Where a bank account contains both community
and separate funds, we presume that the community funds are drawn out first,
before separate funds are withdrawn, and where there are sufficient funds at
all times to cover the separate property balance in the account at the time of
divorce, we presume that the balance remains separate property; this is known
as the Acommunity-out-first@
presumption.  See Welder, 794
S.W.2d at 433.

In the trial court=s
temporary order issued in June 2005, the trial court found that the parties
stipulated that $27,831 Afrom the joint account@ was
Heather=s
separate property, and the trial court ordered Brian to pay it to her.[8]  Brian testified that he deposited $38,661,
the proceeds from the sale of Heather=s
separate property house, into the Mead account in 2002.  The proceeds from the sale of Heather=s
separate property house less $27,831 would amount to $10,830; the trial court=s June
2005 order does not address this amount. 
Rather, it states, AIT IS
FURTHER ORDERED that the balance of the account is still to be determined as to
its character.@








At trial, Brian admitted that he agreed to give
to Heather $27,831 out of his Mead Capital account.  He testified that, since the temporary order,
he had reviewed the account and that he did not believe that the money was
Heather=s
separate property.  Heather=s
attorney objected, and Brian=s
attorney responded by acknowledging that the order stipulated that Athat
money,@
apparently meaning the $27,831, would be paid to her and that it was Heather=s
separate property, although Athe
facts don=t support it.@

At trial, Brian disputed that the funds remaining
in the account had any portion that was Heather=s
separate property.  Brian testified that,
in 2003, the Mead Reserve account dipped below $38,661 to $3,027 when the
parties withdrew $125,000 from the account to purchase TuneUp Masters and when
he transferred $9,000 into his operating account.  Brian first testified that the $9,000 was
used for the parties= living expenses, but then
admitted that $8,000 of those funds were then moved into TuneUp Pro,
L.L.C.  Heather=s
attorney asked Brian, AYou elected to withdraw the
monies.  Had you left those, there would
be sufficient funds to cover Heather=s
balance of separate funds; isn=t that
true?@  Brian replied, AI guess,@ but
reiterated that $16,000 of the funds now remaining in the account were his
separate property from the subsequent sale of his separate property jeep.








The Mead Reserve account statement, entered into
evidence by both parties, illustrates that the account was opened during
marriage, on February 13, 2002.  There
was no tracing at trial with regard to the amounts deposited into the Mead
Reserve account, $1,750, before Brian deposited Heather=s
$38,661 on February 26, 2002.  The
account did not dip below $40,411 until Brian withdrew $125,000 on August 22,
2003.  The account, which previously held
$135,387.80, dropped to $10,387.80. 
After Brian made several deposits, it dropped to $3,027.46 when he
transferred out $9,000, but it never dropped below $3,027.46.  Applying the principles of tracing and the
presumption that community property is removed first, the remaining $3,027.46
was Heather=s separate property.

Brian testified that of the $20,204.22 remaining
in the account, $16,000 was his separate property proceeds from the sale of his
jeep.  Subtracting $16,000 from
$20,204.22, $4,204.22 remained in the account. 
From that $4,204.22, $3,027.46 was Heather=s
separate property.  Because there was no
testimony at trial with regard to the characterization of the remaining
$1,176.76 in the account, these funds are presumed community, and the trial
court had the discretion to allocate them to Heather; therefore, the trial
court had the discretion to allocate to Heather only $4,204.22, and not
$10,830, from Brian=s Mead Reserve Account.  








The difference, $6,625.78, is de minimis within
the context of the entire community estate and both parties=
separate estates and when compared to the amount of each parties=
attorney=s fees
in this matter.  And because Brian
neither argues nor even raises the issue that the trial court divested him of
his separate property when it awarded the extra $6,625.78 to Heather, we are constrained
to conclude that the trial court did not abuse its discretion.[9]  We overrule Brian=s third
point.

IV. Conclusion

Having overruled all of Brian=s
points, we affirm the trial court=s
judgment.

 

 

 

BOB
MCCOY

JUSTICE

 

PANEL: LIVINGSTON,
DAUPHINOT, and MCCOY, JJ.

 

DELIVERED: October 2,
2008











[1]See Tex. R. App. P. 47.4.





[2]He testified that to
foreclose on that note would have put TuneUp Masters out of businessCalthough it would have
reclaimed the California and Nevada locations, those locations Acame with a bunch of
landlord liability that we wouldn=t be able to fund.@





[3]Heather testified that
her most important expense is her tithing a A[m]inimum of ten percent first fruits,@ that she had the same
belief during marriage, and that Brian Aallowed [her] to tithe, he just wouldChe asked that I limit how
much@; her other major expense
involved two mission trips to India.





[4]When separate property
produces income and that income is acquired by a spouse, it is community
property.  Lipsey v. Lipsey, 983
S.W.2d 345, 350 (Tex. App.CFort Worth 1998, no pet.).





[5]The trial court noted
this in a letter to the parties= attorneys on March 12, 2007, a letter Aintended to be the
equivalent of a docket entry,@ and not a final order, in which it stated, 

 

[T]his marriage is a relatively short term marriage between two very
competent, capable, and hard working people. 
There is little doubt in my mind that both . . . have been very
successful and will remain successful throughout their careers.  Each party has pursued [his or her] career
path[], has saved, and/or has spent money according to how each has seen fit. .
. . It simply appears to me that each party should reap the benefits of his or
her labors.





[6]Brian states that
testimony concerning what portion of the options granted were community and
which were separate was uncontested. 





[7]Brian testified that only
$147,980 of Heather=s 401(k) was her separate
property because after they married, the value of the fund dropped from
$153,379.





[8]The parties testified that
they had no joint accounts, however, it becomes clear from the record that the
trial court=s order referred to Brian=s Mead Capital Reserve
account into which Brian deposited both community funds and separate funds from
both parties. 





[9]An appellate court cannot
reverse a trial court=s judgment absent
properly assigned error.  Pat Baker
Co. v. Wilson, 971 S.W.2d 447, 450 (Tex. 1998); Dawson v. Briggs,
107 S.W.3d 739, 744 (Tex. App._Fort Worth 2003, no
pet.).