

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-10-00288-CV

MATTHEW RAY DENNIS            APPELLANT

V.

ANNA MARIE ROWE            APPELLEE

----------

## FROM THE 360TH DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

## I. Introduction

Appellant Matthew Ray Dennis appeals following the trial court's entry of a protective order against him, and he argues in one point that the evidence is legally and factually insufficient to support the trial court's finding that family violence was likely to occur in the future. *See* Tex. Fam. Code Ann. §§ 81.001, 85.001 (West 2008). We affirm.

---

[1]*See* Tex. R. App. P. 47.4.

## II. Background

Anna Marie Rowe, the complainant and Appellee herein, testified that she and Dennis had a dating relationship from August 2007 through January 2010. Their relationship was not continuous; Rowe had ended the relationship ten to fifteen times, and Dennis had persuaded her each time to get back together. They became engaged in July 2009, and Rowe testified that their engagement "was on and off until January 2010" when she decided to end the relationship for good.

Rowe testified that after she had ended their engagement in December 2009, Dennis went to Rowe's house, stayed for more than two hours, and refused to leave. He left only after Rowe agreed to consider getting back together. Rowe also testified that after she broke off the relationship in January 2010, Dennis began exhibiting "stalker behavior" by sending flowers, candy, movies, and text messages to her, and Rowe testified that she responded each time, "Thank you, but it doesn't change my mind." Rowe also testified that throughout their relationship, Dennis told her that "if he ever ended up in a psych ward because of [her] that [she would] be sorry; that [she] would pay." Rowe and Dennis worked together, and Rowe testified that Dennis would stare at her and tell their coworkers how much he loved her, how much he wanted to get back with her, and how she should forgive him.

When Rowe arrived home from work on April 2, 2010, Dennis was waiting for her in her driveway. Rowe had not invited him to her house, and when she

2

saw that he was there, she initially stopped her car and started to leave. But Rowe testified that she "decided that the better thing would be to . . . confront him and to, hopefully, make sure he would understand that it was over. There was not going to be any changing that." Rowe testified that Dennis had a bouquet of roses, tried to give her back the engagement ring, and told her that he wanted to be together. Rowe allowed Dennis into her house, but she testified that she planned to give him five minutes and either ask him to leave or call the police to make him leave.

Rowe testified that, inside the house, Dennis got down on his knees and begged Rowe to take him back. She said that Dennis was very distraught and began crying and that she told him that nothing could change her mind. Rowe testified that Dennis then went into her backyard, pulled a gun from his waistband, and held it to his head. Rowe testified that she was "terrified" that Dennis would kill himself or turn the gun on her. She said that she had never seen Dennis act like that before, that his face was red and contorted, and that he looked very frightening. Dennis told her to go inside and call 9-1-1, but Rowe instead fought with Dennis for the gun. Rowe testified that Dennis pulled the trigger at least ten times—pointing the gun at himself, into the air, or at her each time—but that the gun jammed and did not discharge.

Rowe testified that Dennis eventually left the gun with her and went into the house, and Rowe called 9-1-1. Inside the house, Dennis retrieved a steak knife and stabbed himself in the chest. Dennis also stabbed himself with two

other knives. Rowe testified that she saw blood coming from Dennis's knife wounds and that she believed he had an arterial wound. Rowe also testified that Dennis elbowed her in the jaw twice, causing bruising. Rowe said that she then ran to her front door where she found the police officers that had responded to her 9-1-1 call.

Rowe testified that she did not have any further conversation that day with Dennis, but she said that Dennis sent her a text message that evening that said he had a bad day, was sorry, and would get some help. Rowe testified that she has been to counseling on a weekly basis since the incident, that she takes anxiety medication, and that she is scared to leave her house. Rowe testified that part of her concern is that although Dennis had been divorced for ten years, he had made numerous comments to her about finding someone to kill his ex-wife, that he still "festers complete hate" for his ex-wife, and that Rowe is "scared for [her] life that he would do something or he would act upon this to harm [her]."

Rowe admitted on cross-examination, however, that she had not previously advised anyone other than her mother of Dennis's threats toward his ex-wife. Rowe also agreed that Dennis had not caused her bodily injury at any time during their relationship; that although their relationship had been stormy, there had not been any physical violence before or after the incident; that Dennis did not intend to cause her physical harm when he first put the gun to his head in her backyard; and that Dennis had not threatened to harm her before she intervened and tried to take the gun from him. Moreover, Rowe admitted that

4

she had sent Dennis numerous text messages between January and March 2010 and that Dennis had not attempted to contact her after his text message to her the night of the incident.

Dennis testified that he often carried a concealed handgun, that he did not have a license to carry a concealed weapon, that it was not unusual for him to have a gun at Rowe's house, and that he did not ask Rowe's permission before taking a gun to her house. Dennis also testified that he went to Rowe's house on April 2, 2010, to retrieve some of his things; that he did not initially intend to kill himself; but that his intent changed after his conversation with Rowe became heated. Dennis denied that he ever intended to harm Rowe, and although he admitted that the gun was pointed at her during the struggle, he denied pulling the trigger while the gun was pointed at Rowe or doing so with the intent of threatening her.

Dennis testified that he had not attempted to reconcile with Rowe after the incident because he had, through treatment, realized the toxic nature of their relationship. However, Dennis, a technician on the psychiatric ward of a local hospital, testified that he had seen multiple patients return after receiving treatment; that he had seen multiple patients stop taking their medications; and that there is a "high probability" that violence would occur in the future if a patient had been violent in the past. Finally, explaining the statements he made to Rowe about his ex-wife, Dennis testified, "I say that in joking because my ex-wife is

5

probably one of the worst ladies on the face of the earth, I'm sorry. There is no love loss there between her and my ex-mother-in law either."

Linda Burnside, a nurse, testified that she knew and worked with both Dennis and Rowe. She testified that she had talked at length with Rowe about her relationship with Dennis but that Rowe had not reported being afraid of or injured by Dennis. Burnside testified that family violence was not likely to occur in the future, but she admitted that she had no personal knowledge of what occurred in Dennis's or Rowe's homes when she was not present and that there were things she did not know about them.

Mary Potter testified that she worked with Dennis and Rowe and that both of them had discussed their relationship with her. She acknowledged that she did not know them outside of a working relationship, but she said that Rowe had not mentioned any violence or fear of Dennis. Potter testified that family violence was not likely to occur in the future, but she admitted that she did not consider Dennis suicidal before he tried to kill himself at Rowe's home.

Alisha Hamilton testified that she had worked with Rowe and Dennis; that she had seen Rowe outside of work on occasion; and that Rowe had not mentioned any incidents of violence, threats, or fear relating to Dennis. Hamilton testified that family violence was not likely to occur in the future and that "there was a lot of drama that went on" between Rowe and Dennis, but she "never knew of any violence." She also testified that she was surprised that Dennis attempted suicide.

## III. Discussion

Dennis contends in one point that the evidence is legally and factually insufficient to support the trial court's finding that family violence was likely to occur in the future.

### A. Standards of Review

"[W]e review appellate challenges to the granting of protective orders for sufficiency of the evidence, measured by legal and factual sufficiency contentions." *Schaban-Maurer v. Maurer-Schaban*, 238 S.W.3d 815, 823 (Tex. App.—Fort Worth 2007, no pet.), *disapproved on other grounds*, *Iliff v. Iliff*, 339 S.W.3d 74 (Tex. 2011). We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362–63 (1960). In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228

S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005).

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

## B. Application

A trial court must render a protective order "if the court finds that family violence has occurred and is likely to occur in the future." Tex. Fam. Code Ann. §§ 81.001, 85.001. "Family violence" includes "dating violence," which means

> an act by an individual that is against another individual with whom that person has or has had a dating relationship and that is intended to result in physical harm, bodily injury, assault, or sexual assault or that is a threat that reasonably places the individual in fear of imminent physical harm, bodily injury, assault, or sexual assault, but does not include defensive measures to protect oneself.

*Id.* §§ 71.004, .0021(a) (West 2008). Dennis does not challenge that the April 2, 2010 incident constituted family violence; instead, he challenges the trial court's finding that family violence was likely to occur in the future.

In the context of protective orders, Texas law recognizes that evidence showing that a person has engaged in abusive conduct in the past permits an

inference that the person will continue such conduct in the future. *See In re Epperson*, 213 S.W.3d 541, 543–44 (Tex. App.—Texarkana 2007, no pet.); *In re T.L.S.*, 170 S.W.3d 164, 166 (Tex. App.—Waco 2005, no pet.); *Pena v. Garza*, 61 S.W.3d 529, 532 (Tex. App.—San Antonio 2001, no pet.). As noted in *Epperson*, "Often times, past is prologue; therefore, past . . . conduct can be competent evidence which is legally and factually sufficient to sustain the award of a protective order." 213 S.W.3d at 544.

The April 2, 2010 incident permits an inference that Dennis would engage in similar conduct in the future. *See id.* at 543–44; *T.L.S.*, 170 S.W.3d at 166; *Pena*, 61 S.W.3d at 532. But in addition to the April 2, 2010 incident, the trial court also heard evidence that Dennis often carried a concealed handgun—for which he did not have a license—at Rowe's home without her permission; that Dennis had visited Rowe's house in December 2009 and had refused to leave for more than two hours; that Dennis had continued to try to reconcile with Rowe despite Rowe's repeated statements and text messages that nothing would change her mind; that Dennis had told Rowe on multiple occasions that she would "be sorry" or "would pay" if he ended up in a psychiatric ward because of her; and that Dennis, ten years after his divorce, still talked about finding someone to kill his ex-wife. Dennis testified that his statements about his ex-wife were in jest, that he had never threatened or physically harmed Rowe before the April 2, 2010 incident, and that Rowe often responded to his text messages and initiated other text messages to him. But the trial court is the sole judge of the

9

credibility of witnesses and the weight to be given to their testimony, and the trial court could have believed Rowe's testimony and disbelieved the testimony by Dennis and those that denied the likelihood of future violence. *See Pena*, 61 S.W.3d at 532.

Citing *In re J.A.T.*, No. 13-04-00477-CV, 2005 WL 1981497, at *1–2 (Tex. App.—Corpus Christi Aug. 18, 2005, no pet.) (mem. op.), Dennis argues that the April 2, 2010 incident was his only act of violence toward Rowe and that although past abusive conduct permits an inference of future violent behavior, one act of violence does not amount to a course of conduct. But unlike *J.A.T.*, there is evidence of more than one incident involving the parties. And although the other incidents, standing alone, did not rise to the level of family violence, they circumstantially support the trial court's finding that family violence was likely to occur in the future.

After reviewing all of the evidence in the light favorable to the trial court's finding, crediting favorable evidence if a reasonable factfinder could, and disregarding contrary evidence unless a reasonable factfinder could not, we hold that there is legally sufficient evidence to support the trial court's finding that family violence was likely to occur in the future. Likewise, after considering and weighing all of the evidence pertinent to the trial court's finding, we cannot say that the evidence supporting the trial court's finding is so weak or contrary to the overwhelming weight of all the evidence that it should be set aside and a new trial ordered. *See T.L.S.,* 170 S.W.3d at 166–67 (holding evidence of future

family violence legally and factually sufficient because unchallenged findings of past family violence supported trial court's inference of future family violence); *Pena*, 61 S.W.3d at 532 (noting conflicting evidence at trial and trial court's role as factfinder, and holding legally and factually sufficient evidence supported future family violence finding); *see also K.D. v. D.D.*, No. 04-09-00091-CV, 2010 WL 724373, at *5–6 (Tex. App.—San Antonio Mar. 3, 2010, no pet.) (holding evidence of future family violence legally sufficient based on inference from past conduct and past threat to harm complainant if complainant reported sexual abuse). We overrule Dennis's sole point.

## IV. Conclusion

Having overruled Dennis's sole point, we affirm the trial court's judgment.

PER CURIAM

PANEL: GARDNER, DAUPHINOT, and MEIER, JJ.

DELIVERED: August 11, 2011

11