02-10-288-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

NO.  02-10-00288-CV

 

 


 
 
 Matthew Ray Dennis
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 Anna Marie Rowe
 
 
  
 
 
 APPELLEE
 
 


 

 

----------

 

FROM THE 360th
District Court OF Tarrant COUNTY

----------

 

MEMORANDUM
OPINION[1]

----------

 

I. 
Introduction

          Appellant
Matthew Ray Dennis appeals following the trial court’s entry of a protective
order against him, and he argues in one point that the evidence is legally and
factually insufficient to support the trial court’s finding that family violence
was likely to occur in the future.  See Tex. Fam. Code Ann. §§ 81.001,
85.001 (West 2008).  We affirm.

II. 
Background

          Anna
Marie Rowe, the complainant and Appellee herein, testified that she and Dennis
had a dating relationship from August 2007 through January 2010. Their
relationship was not continuous; Rowe had ended the relationship ten to fifteen
times, and Dennis had persuaded her each time to get back together. They became
engaged in July 2009, and Rowe testified that their engagement “was on and off
until January 2010” when she decided to end the relationship for good.

          Rowe
testified that after she had ended their engagement in December 2009, Dennis
went to Rowe’s house, stayed for more than two hours, and refused to leave.  He
left only after Rowe agreed to consider getting back together.  Rowe also
testified that after she broke off the relationship in January 2010, Dennis
began exhibiting “stalker behavior” by sending flowers, candy, movies, and text
messages to her, and Rowe testified that she responded each time, “Thank you,
but it doesn’t change my mind.”  Rowe also testified that throughout their
relationship, Dennis told her that “if he ever ended up in a psych ward because
of [her] that [she would] be sorry; that [she] would pay.”  Rowe and Dennis
worked together, and Rowe testified that Dennis would stare at her and tell
their coworkers how much he loved her, how much he wanted to get back with her,
and how she should forgive him. 

          When
Rowe arrived home from work on April 2, 2010, Dennis was waiting for her in her
driveway.  Rowe had not invited him to her house, and when she saw that he was
there, she initially stopped her car and started to leave.  But Rowe testified
that she “decided that the better thing would be to . . . confront him and to,
hopefully, make sure he would understand that it was over.  There was not going
to be any changing that.”  Rowe testified that Dennis had a bouquet of roses,
tried to give her back the engagement ring, and told her that he wanted to be
together.  Rowe allowed Dennis into her house, but she testified that she planned
to give him five minutes and either ask him to leave or call the police to make
him leave. 

          Rowe
testified that, inside the house, Dennis got down on his knees and begged Rowe
to take him back.  She said that Dennis was very distraught and began crying
and that she told him that nothing could change her mind.  Rowe testified that
Dennis then went into her backyard, pulled a gun from his waistband, and held
it to his head.  Rowe testified that she was “terrified” that Dennis would kill
himself or turn the gun on her.  She said that she had never seen Dennis act like
that before, that his face was red and contorted, and that he looked very
frightening.  Dennis told her to go inside and call 9-1-1, but Rowe instead
fought with Dennis for the gun.  Rowe testified that Dennis pulled the trigger
at least ten times—pointing the gun at himself, into the air, or at her each
time—but that the gun jammed and did not discharge.

          Rowe
testified that Dennis eventually left the gun with her and went into the house,
and Rowe called 9-1-1.  Inside the house, Dennis retrieved a steak knife and
stabbed himself in the chest.  Dennis also stabbed himself with two other
knives.  Rowe testified that she saw blood coming from Dennis’s knife wounds
and that she believed he had an arterial wound.  Rowe also testified that
Dennis elbowed her in the jaw twice, causing bruising.  Rowe said that she then
ran to her front door where she found the police officers that had responded to
her 9-1-1 call.

Rowe
testified that she did not have any further conversation that day with Dennis,
but she said that Dennis sent her a text message that evening that said he had
a bad day, was sorry, and would get some help.  Rowe testified that she has
been to counseling on a weekly basis since the incident, that she takes anxiety
medication, and that she is scared to leave her house.  Rowe testified that
part of her concern is that although Dennis had been divorced for ten years, he
had made numerous comments to her about finding someone to kill his ex-wife,
that he still “festers complete hate” for his ex-wife, and that Rowe is “scared
for [her] life that he would do something or he would act upon this to harm
[her].”

Rowe
admitted on cross-examination, however, that she had not previously advised
anyone other than her mother of Dennis’s threats toward his ex-wife.  Rowe also
agreed that Dennis had not caused her bodily injury at any time during their
relationship; that although their relationship had been stormy, there had not
been any physical violence before or after the incident; that Dennis did not
intend to cause her physical harm when he first put the gun to his head in her
backyard; and that Dennis had not threatened to harm her before she intervened
and tried to take the gun from him.  Moreover, Rowe admitted that she had sent
Dennis numerous text messages between January and March 2010 and that Dennis
had not attempted to contact her after his text message to her the night of the
incident.

          Dennis
testified that he often carried a concealed handgun, that he did not have a
license to carry a concealed weapon, that it was not unusual for him to have a
gun at Rowe’s house, and that he did not ask Rowe’s permission before taking a
gun to her house.  Dennis also testified that he went to Rowe’s house on April
2, 2010, to retrieve some of his things; that he did not initially intend to
kill himself; but that his intent changed after his conversation with Rowe
became heated.  Dennis denied that he ever intended to harm Rowe, and although
he admitted that the gun was pointed at her during the struggle, he denied pulling
the trigger while the gun was pointed at Rowe or doing so with the intent of
threatening her.

          Dennis
testified that he had not attempted to reconcile with Rowe after the incident
because he had, through treatment, realized the toxic nature of their
relationship.  However, Dennis, a technician on the psychiatric ward of a local
hospital, testified that he had seen multiple patients return after receiving
treatment; that he had seen multiple patients stop taking their medications;
and that there is a “high probability” that violence would occur in the future
if a patient had been violent in the past.  Finally, explaining the statements
he made to Rowe about his ex-wife, Dennis testified, “I say that in joking
because my ex-wife is probably one of the worst ladies on the face of the
earth, I’m sorry.  There is no love loss there between her and my ex-mother-in
law either.”

          Linda
Burnside, a nurse, testified that she knew and worked with both Dennis and
Rowe.  She testified that she had talked at length with Rowe about her
relationship with Dennis but that Rowe had not reported being afraid of or
injured by Dennis.  Burnside testified that family violence was not likely to
occur in the future, but she admitted that she had no personal knowledge of
what occurred in Dennis’s or Rowe’s homes when she was not present and that
there were things she did not know about them.

          Mary
Potter testified that she worked with Dennis and Rowe and that both of them had
discussed their relationship with her.  She acknowledged that she did not know
them outside of a working relationship, but she said that Rowe had not mentioned
any violence or fear of Dennis.  Potter testified that family violence was not
likely to occur in the future, but she admitted that she did not consider
Dennis suicidal before he tried to kill himself at Rowe’s home.

          Alisha
Hamilton testified that she had worked with Rowe and Dennis; that she had seen
Rowe outside of work on occasion; and that Rowe had not mentioned any incidents
of violence, threats, or fear relating to Dennis.  Hamilton testified that
family violence was not likely to occur in the future and that “there was a lot
of drama that went on” between Rowe and Dennis, but she “never knew of any
violence.”  She also testified that she was surprised that Dennis attempted
suicide.

III. 
Discussion

Dennis
contends in one point that the evidence is legally and factually insufficient
to support the trial court’s finding that family violence was likely to occur
in the future.

A. 
Standards of Review

          “[W]e
review appellate challenges to the granting of protective orders for
sufficiency of the evidence, measured by legal and factual sufficiency
contentions.”  Schaban-Maurer v. Maurer-Schaban, 238 S.W.3d 815, 823
(Tex. App.—Fort Worth 2007, no pet.), disapproved on other grounds, Iliff
v. Iliff, 339 S.W.3d 74 (Tex. 2011).  We may sustain a legal sufficiency
challenge only when (1) the record discloses a complete absence of evidence of
a vital fact; (2) the court is barred by rules of law or of evidence from
giving weight to the only evidence offered to prove a vital fact; (3) the
evidence offered to prove a vital fact is no more than a mere scintilla; or (4)
the evidence establishes conclusively the opposite of a vital fact.  Uniroyal
Goodrich Tire Co. v. Martinez, 977 S.W.2d 328, 334 (Tex. 1998), cert.
denied, 526 U.S. 1040 (1999); Robert W. Calvert, "No Evidence"
and "Insufficient Evidence" Points of Error, 38 Tex. L. Rev. 361,
362–63 (1960).  In determining whether there is legally sufficient evidence to
support the finding under review, we must consider evidence favorable to the
finding if a reasonable factfinder could and disregard evidence contrary to the
finding unless a reasonable factfinder could not.  Cent. Ready Mix Concrete
Co. v. Islas, 228 S.W.3d 649, 651 (Tex. 2007); City of Keller v. Wilson,
168 S.W.3d 802, 807, 827 (Tex. 2005).

When
reviewing an assertion that the evidence is factually insufficient to support a
finding, we set aside the finding only if, after considering and weighing all
of the evidence in the record pertinent to that finding, we determine that the
credible evidence supporting the finding is so weak, or so contrary to the
overwhelming weight of all the evidence, that the answer should be set aside
and a new trial ordered.  Pool v. Ford Motor Co., 715 S.W.2d 629, 635
(Tex. 1986) (op. on reh’g); Garza v. Alviar, 395 S.W.2d 821, 823 (Tex.
1965).

B. 
Application

          A
trial court must render a protective order “if the court finds that family
violence has occurred and is likely to occur in the future.”  Tex. Fam. Code
Ann. §§ 81.001, 85.001.  “Family violence” includes “dating violence,” which
means

an act by an individual
that is against another individual with whom that person has or has had a
dating relationship and that is intended to result in physical harm, bodily
injury, assault, or sexual assault or that is a threat that reasonably places
the individual in fear of imminent physical harm, bodily injury, assault, or
sexual assault, but does not include defensive measures to protect oneself.

 

Id. §§
71.004, .0021(a) (West 2008).  Dennis does not challenge that the April 2, 2010
incident constituted family violence; instead, he challenges the trial court’s
finding that family violence was likely to occur in the future.

In
the context of protective orders, Texas law recognizes that evidence showing that
a person has engaged in abusive conduct in the past permits an inference that
the person will continue such conduct in the future.  See In re
Epperson, 213 S.W.3d 541, 543–44 (Tex. App.—Texarkana 2007, no pet.); In
re T.L.S., 170 S.W.3d 164, 166 (Tex. App.—Waco 2005, no pet.); Pena v.
Garza, 61 S.W.3d 529, 532 (Tex. App.—San Antonio 2001, no pet.).  As noted
in Epperson, “Often times, past is prologue; therefore, past . . . conduct
can be competent evidence which is legally and factually sufficient to sustain
the award of a protective order.”  213 S.W.3d at 544.

The
April 2, 2010 incident permits an inference that Dennis would engage in similar
conduct in the future.  See id. at 543–44; T.L.S., 170
S.W.3d at 166; Pena, 61 S.W.3d at 532.  But in addition to the April 2,
2010 incident, the trial court also heard evidence that Dennis often carried a
concealed handgun—for which he did not have a license—at Rowe’s home without
her permission; that Dennis had visited Rowe’s house in December 2009 and had refused
to leave for more than two hours; that Dennis had continued to try to reconcile
with Rowe despite Rowe’s repeated statements and text messages that nothing
would change her mind; that Dennis had told Rowe on multiple occasions that she
would “be sorry” or “would pay” if he ended up in a psychiatric ward because of
her; and that Dennis, ten years after his divorce, still talked about finding
someone to kill his ex-wife.  Dennis testified that his statements about his
ex-wife were in jest, that he had never threatened or physically harmed Rowe
before the April 2, 2010 incident, and that Rowe often responded to his text
messages and initiated other text messages to him.  But the trial court is the
sole judge of the credibility of witnesses and the weight to be given to their
testimony, and the trial court could have believed Rowe’s testimony and
disbelieved the testimony by Dennis and those that denied the likelihood of
future violence.  See Pena, 61 S.W.3d at 532.

Citing
In re J.A.T., No. 13-04-00477-CV, 2005 WL 1981497, at *1–2 (Tex.
App.—Corpus Christi Aug. 18, 2005, no pet.) (mem. op.), Dennis argues that the
April 2, 2010 incident was his only act of violence toward Rowe and that
although past abusive conduct permits an inference of future violent behavior,
one act of violence does not amount to a course of conduct.  But unlike J.A.T.,
there is evidence of more than one incident involving the parties.  And
although the other incidents, standing alone, did not rise to the level of
family violence, they circumstantially support the trial court’s finding that
family violence was likely to occur in the future. 

After
reviewing all of the evidence in the light favorable to the trial court’s
finding, crediting favorable evidence if a reasonable factfinder could, and
disregarding contrary evidence unless a reasonable factfinder could not, we
hold that there is legally sufficient evidence to support the trial court’s
finding that family violence was likely to occur in the future.  Likewise,
after considering and weighing all of the evidence pertinent to the trial
court’s finding, we cannot say that the evidence supporting the trial court’s
finding is so weak or contrary to the overwhelming weight of all the evidence
that it should be set aside and a new trial ordered.  See T.L.S., 170
S.W.3d at 166–67 (holding evidence of future family violence legally and
factually sufficient because unchallenged findings of past family violence
supported trial court’s inference of future family violence); Pena, 61
S.W.3d at 532 (noting conflicting evidence at trial and trial court’s role as
factfinder, and holding legally and factually sufficient evidence supported future
family violence finding); see also K.D. v. D.D., No.
04-09-00091-CV, 2010 WL 724373, at *5–6 (Tex. App.—San Antonio Mar. 3, 2010, no
pet.) (holding evidence of future family violence legally sufficient based on
inference from past conduct and past threat to harm complainant if complainant
reported sexual abuse).  We overrule Dennis’s sole point.

IV. 
Conclusion

Having
overruled Dennis’s sole point, we affirm the trial court’s judgment.

 

PER CURIAM

 

 

PANEL: 
GARDNER,
DAUPHINOT, and MEIER, JJ.

 

DELIVERED:  August 11, 2011









[1]See Tex. R. App. P. 47.4.